*563
 
 Opinion
 

 HAERLE, J.
 

 I. Introduction
 

 Carl Clinton Snyder (Carl) appeals the trial court’s grant of summary judgment to United States Fidelity & Guaranty Company (USF&G) and J.P. Simpson (Simpson), its agent (respondents). His complaint sought to hold respondents liable on a guardianship surety bond taken out by Carl’s parents and guardians for losses suffered when his father stole funds from the guardianship account. Carl claims that a release he signed in favor of USF&G upon obtaining his majority is ineffective and that USF&G and Simpson breached duties they owed him. We reverse as to USF&G and affirm as to Simpson.
 

 II. Factual and Procedural Background
 

 In January 1982, a guardianship was established for Carl by his parents, Dana and Roxanne Snyder, who were named his guardians. The funds in the account were the result of a legacy left to Carl by a paternal great-aunt. Lee Amaral, the guardians’ attorney, contacted Simpson about a surety bond for the guardians. Simpson, acting as the agent of USF&G, procured a bond for Dana and Roxanne Snyder as principals from USF&G in the amount of $35,000, the amount of the bond originally ordered by the court. In 1983, and again responsive to a court order, the bond was increased by $75,000 to a total of $110,000.
 

 The guardianship estate consisted of funds totaling approximately $99,000 in 1982. These funds were deposited in an interest-bearing account at Community First National Bank in Pleasanton, but the account was not set up as a blocked account. The signature card for withdrawal of funds required two signatures: that of either Dana or Roxanne Snyder
 
 and
 
 that of either Amaral or Simpson. Simpson stated he was a signatory on the account for the sole purpose of protecting the interests of USF&G, and that he discussed this with Amaral at the time he became a signatory.
 

 The first required accounting of the guardianship estate was approved by the probate court on June 15, 1983. Only this original accounting was ever made. Sometime prior to July 1991, Amaral discontinued his California law practice and moved out of the state. Apparently, no attorney took over his responsibilities as attorney to Dana and Roxanne Snyder as guardians. In 1991, the signature card was changed to delete Amaral. On April 3, 1991,
 
 *564
 
 Carl turned 18 years old, and thus became an adult. Carl knew that, when he turned 18, the funds in the guardianship estate belonged to him. At this point in time, the estate property totaled approximately $152,000.
 

 Carl knew that court action was required to transfer the estate assets into his name. Dana Snyder had contacted an attorney for the purpose of a final accounting, but no such accounting was ever prepared or filed. Instead, Dana Snyder, accompanied by Carl, went to Simpson’s office in July 1991 to discuss withdrawing funds to pay for Carl’s college education.
 

 Prior to July 1991, Simpson had had no contact with the guardians or with Carl. Simpson was aware that, at the time of Dana Snyder’s request for his signature to withdraw funds, a final accounting had not been approved by the Alameda County Superior Court, but stated that Dana Snyder told him another law firm was preparing one. Simpson also knew that Amaral was no longer living or practicing law in California. Simpson informed Dana Snyder that he would not sign for withdrawals of funds without a release from Carl of USF&G’s surety bond obligations. Simpson sent a standard USF&G release form to Dana Snyder.
 

 Carl signed the release on August 2, 1991. Carl testified that he read the document before signing it, but was not sure what it meant. He stated that he did not understand that he was releasing USF&G from liability on the bond. Dana Snyder, however, testified in deposition that he explained “what the release was about” to Carl.
 

 At the time he signed the release, Carl knew, and had known for years, that his father was a longtime heroin addict. There is no evidence that either Simpson or USF&G knew this fact.
 

 In August 1991, Dana Snyder began withdrawing funds from the guardianship account for Carl. Simpson authorized the withdrawal each time. By September 1, 1991, approximately $68,000 had been withdrawn from the account and paid to Carl. Carl, along with his father, visited Simpson twice to authorize withdrawal of money from the account. Carl believes the first time they visited Simpson was in approximately November 1991, with the second being in 1992. Of the written requests for authorization to withdraw funds, some indicated Carl as payee, some indicated Dana Snyder as payee, and some indicated the Internal Revenue Sendee as payee. On November 11, 1991, Carl authorized a check made payable to his father in the amount of $1,000. No final accounting or formal discharge of the guardians through court proceedings ever took place.
 

 It is unclear from the record when Dana Snyder began embezzling funds from Carl’s account, although there are assertions that it began in August
 
 *565
 
 1992. In all, he apparently stole approximately $45,000. Dana Snyder testified that he stole the funds to support his drug habit, and that Carl was not aware that he was withdrawing funds for his own use.
 

 In December 1992, Carl became aware that his father had invaded these funds for his own purposes. Carl and his mother brought this to Simpson’s attention. Prior to this time, Simpson had been aware of no wrongdoing.
 

 Carl sued Simpson and USF&G seeking recovery on the bond and claiming breach of various legal duties. The court stayed the action and ordered Carl to seek a surcharge order, after which he could seek relief from the stay. Carl obtained a surcharge order against his father only dated June 16, 1995; the order was in the amount of $45,980 plus interest effective January 11,
 

 1993.
 

 On April 15, 1996, the trial court granted Simpson and USF&G’s motion for summary judgment. It found there was no triable issue of fact as to the validity of the release, that neither Simpson nor USF&G owed Carl a duty of care or a fiduciary duty, and that neither was guilty of bad faith. Carl timely appealed.
 

 HI. Discussion
 

 A.
 
 Introduction
 

 A
 
 grant of summary judgment is reviewed de novo. Summary judgment is appropriate where there are no issues of material fact, and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c.)
 
 [1]
 
 A defendant moving for summary judgment must show either that the plaintiff cannot establish an essential element of the cause of action or that the defendant has a complete defense.
 
 (Brantley
 
 v.
 
 Pisaro
 
 (1996) 42 Cal.App.4th 1591, 1594 [50 Cal.Rptr.2d 431]; § 437c, subd. (o)(2).) The burden then shifts to the plaintiff to establish the existence of a genuine issue of material fact as to the existence of the element challenged by the defendant. (42 Cal.App.4th at p. 1594.) To defeat the motion for summary judgment, the plaintiff must show “ ‘specific facts,’ ” and cannot rely upon the allegations of the pleadings.
 
 (Ibid.)
 

 Carl advances several arguments in favor of reversal, including several separate and distinct contentions as to why the release he admittedly signed is ineffective to relieve respondents of liability on the bond. We agree
 
 *566
 
 with one of his contentions, to wit, that the release was ineffective because court approval was required to cancel the bond. We thus reverse the grant of summary judgment as to USF&G on the first cause of action. However, we affirm the grant of summary judgment as to both defendants as to the remaining causes of action.
 

 B.
 
 The Claim Against the Bond
 

 The first cause of action of the first amended complaint was brought only against USF&G and was entitled “Recovery on the Bond.”
 

 The first $35,000 bond was issued pursuant to a court order of January 6, 1982, and was itself dated and filed January 25, 1982. The court increased the required amount to $110,000 by an order dated June 15, 1983. Respondent USF&G satisfied this order by providing an “Additional Bond of Guardians” dated June 16, 1983, in the amount of $75,000.
 

 The current Bond and Undertaking Law (§ 995.010 et seq.) was enacted by the Legislature in 1982 and is expressly made applicable to a bond or undertaking given on or after January 1, 1983, and also to one given before that date if, as was done here, the surety provides an additional bond on or after that date. (§ 995.020, subd. (b)(1) & (2).) Thus, that law generally governs as to the full amount of the bond implicated here. (We say “generally” because, at numerous points, the Legislature has made clear that if, as, and when the statute pursuant to which the bond is furnished “prescribes a different rule or is inconsistent” with the Bond and Undertaking Law, the specific “requiring statute” governs. [§995.020, subd. (a); see also Prob. Code, § 2320, subd. (c) and
 
 Milo Equipment Corp.
 
 v.
 
 Elsinore Valley Mun. Water Dist.
 
 (1988) 205 Cal.App.3d 1282, 1285-1286 [253 Cal.Rptr. 126]].)
 

 In contending that any release of a surety on a statutory bond must be pursuant to a court order, Carl relies heavily on a recent decision of Division Four of this appellate district,
 
 Lewin
 
 v.
 
 Anselmo
 
 (1997) 56 Cal.App.4th 694 [65 Cal.Rptr.2d 682]
 
 (Lewin).
 
 In that case, the principal, an attorney-defendant who was appealing an adverse judgment, secured personal sureties on his appeal bond. The latter added a handwritten notation to their bond to the effect that they had 15 days from the date of execution “ ‘to fully cancel + rescind’ ” it. Within the 15 days, they filed and served a document purporting to do exactly that. When the beneficiaries of the appeal bond, the judgment creditors, sued on it, the trial court gave effect to the handwritten addition, holding that the bond “ ‘was rescinded timely.’ ”
 
 (Id.
 
 at pp. 697-698.) Our colleagues in Division Four reversed, holding unanimously that the purported rescission was inconsistent with the Bond and Undertaking Law.
 

 
 *567
 
 The court first discussed the background of the 1982 legislation, and the provisions in it (§§ 995.320, 995.330 & 995.380, subd. (a)) the court held collectively, meant that wording in excess of that mandated by the statute was ineffectual “surplusage.”
 
 (Lewin, supra,
 
 56 Cal.App.4th at p. 699.) It then turned to the issue of “when a statutory bond becomes effective and, once in effect, how it may be withdrawn.”
 
 (Ibid.)
 
 The court first dealt with the sureties’ contention that the 15-day rescission provision was valid as a condition precedent. It rejected this contention, noting that, pursuant to section 995.420, the bond necessarily became effective “ ‘at the time it is given’ ” and that any provision in it to the contrary was, again, ineffectual surplusage. (56 Cal.App.4th at pp. 699-700.)
 

 It then addressed the alternate argument of the sureties and answered it in the following words: “If, on the other hand, the [sureties’] handwritten notation were construed to be a condition subsequent permitting them 15 days after it had become effective within which to unilaterally withdraw from the bond, it would conflict with section 996.110.
 
 That section provides that a surety on a bond given in an action or proceeding may be released from liability on that bond only by order of the court, following a properly noticed hearing.
 
 (§ 996.110.) At that hearing, the court must determine ‘whether injury to the beneficiary would result from substitution or release of the surety.’ (§ 996.120.) In this case, it is undisputed that the [sureties] did not notice or request the scheduling of any hearing.”
 
 (Lewin, supra,
 
 56 Cal.App.4th at p. 700, italics added.)
 

 Section 996.110, upon which the court relied in its holding, reads:
 

 “(a) A surety on a bond given in an action or proceeding may at any time apply to the court for an order that the surety be released from liability on the bond.
 

 “(b) The principal on a bond may, if a surety applies for release from liability on a bond, apply to the court for an order that another surety be substituted for the original surety.
 

 “(c) The applicant shall serve on the principal or surety (other than the applicant) and on the beneficiary a copy of the application and a notice of hearing on the application. Service shall be made not less than 15 days before the date set for hearing.”
 

 At oral argument and in supplemental briefing we requested, the parties debated the pivotal issue of whether
 
 Lewin’s
 
 holding, especially the language italicized above, applies here or whether, on the other hand, the
 
 *568
 
 existence of a voluntary release of the surety by the beneficiary, executed after the latter came of age, changes matters.
 

 Respondents argue that, first of all, the critical language of section 996.110, subdivision (a), says only that a surety “may” (not “must” or “shall”) apply to the court for an order releasing it. They argue from this that a court order is not “mandatory where, as here, the beneficiary voluntarily provides a release in order to obtain guardianship funds . . . .” Nothing in the section, they go on, prohibits the bilateral or multilateral release of a bond
 
 sans
 
 court approval. They argue that the
 
 Lewin
 
 court’s formulation of the meaning of section 996.110 is too broad, and would have us confine it to “unilateral attempts of a surety to be released.”
 

 They also contend that more germane to the present situation than section 996.110 is section 995.430. That section reads:
 

 “A bond remains in force and effect until the earliest of the following events:
 

 “(a) The sureties withdraw from or cancel the bond or a new bond is given in place of the original bond.
 

 “(b) The purpose for which the bond was given is satisfied or the purpose is abandoned without any liability having been incurred.
 

 “(c) A judgment of liability on the bond that exhausts the amount of the bond is satisfied.
 

 “(d) The term of the bond expires. Unless the statute providing for the bond prescribes a fixed term, the bond is continuous.”
 

 Respondents contend that the facts of this case bring it within subdivision (b) of section 995.430 because, by virtue of the release they executed in August 1991, all three parties “ ‘abandoned’ the purpose for which USF&G’s bond was given ‘without any liability having been incurred.’ ”
 
 [2]
 
 They argue that this section, plus Civil Code section 1541 dealing with civil releases generally, should be interpreted in a manner consistent with the general policy of the law to let competent parties manage their own affairs.
 

 Carl, on the other hand, notes that, under Probate Code section 2320, a guardian appointed by the court must give a bond which, itself, must be
 
 *569
 
 “approved by the court.” (Prob. Code, § 2320, subd. (a).) He goes on to contend that the principle announced in
 
 Lewin
 
 is correct as stated, and suggests other provisions of the Bond and Undertaking Law effectively confirm that a court order is necessary before a court-approved surety bond in a guardianship proceeding may be released.
 

 We agree with Carl, both for the reasons he advances and others. In the first place, it is important to emphasize an essential premise of
 
 Lewin:
 
 There is a difference between “statutory bonds” and other bonds. The former are carefully regulated by statute, and the statutory terms relative to them are mandatory.
 
 (Lewin, supra,
 
 56 Cal.App.4th at pp. 698-700.) The latter are dealt with in a different statutory framework. (See, e.g., §§ 996.310-996.360.)
 

 The law governing statutory bonds (the Bond and Undertaking Law and the applicable provisions of the statute requiring the bond) serves “to protect the rights of the beneficiary
 
 and to protect the integrity of the bonding procedures.” (Lewin, supra,
 
 56 Cal.App.4th at p. 700, italics added.) One of the parties necessarily involved in the “integrity of the bonding process” is, of course, the court itself. Under the statutory scheme, the court initially orders the posting of the bond and approves the bond
 
 and
 
 the surety. (See Prob. Code, §§ 1514 & 2320; see generally, Prob. Code, § 2102.) And at the conclusion of the process, it must approve the discharge of the principal. (See
 
 Maloney
 
 v.
 
 Mass. Bonding & Ins. Co.
 
 (1942) 20 Cal.2d 1, 9 [123 P.2d 449].) It is entirely consistent with this framework that, as the
 
 Lewin
 
 court ruled, the same court should approve the release of a surety on a statutory bond.
 

 This is so not simply to ensure that our probate judges and commissioners have an ample supply of papers to review. It is vital to remember in all of this that, before a court can discharge a principal or release a surety in a guardianship proceeding, there must be either an accounting filed or other inquiry made by the court as to whether there has been or may be injury to the beneficiary. (See, e.g., § 996.120 and Prob. Code, § 2620 et seq.) It is, of course, the court that initially approves both the guardian and the surety and its bond and it is the court, therefore, that has the responsibility of determining if the former has injured or impaired the beneficiary’s assets during his or her term of office. If so, the surety is “on the hook.” It is, as just noted, also the statutorily imposed responsibility of the court to approve the surety and its bond. Thus, in the entire process, the efficacy and integrity of the probate court and its orders are implicated. As a consequence, the bilateral or multilateral actions of the parties involved, no matter how “voluntary” they may be, cannot divest the probate court of its right, indeed its duty, to formally sanction any release of a surety.
 

 
 *570
 
 This conclusion finds strong support in the statutory provisions of both the Bond and Undertaking Law and the Probate Code. The “may” language of section 996.110 does not mean, as respondents suggest, that it is optional with a surety to follow the procedure there specified. Rather, it means that, although a surety need not seek its own release,
 
 [3]
 
 if it elects to do so it must proceed via a noticed motion.
 
 [4]
 
 At the hearing on that motion, the court must determine whether the release of the surety would effect any “injury to the beneficiary.” (§ 996.120.)
 

 The necessity of a court order to validate the release of a surety on a statutory bond is confirmed by section 996.150 dealing with the effect of a surety’s release. The opening phrase of that section is: “If a surety is ordered released from liability on a bond . . . The implication seems clear: A surety is not released unless it is so ordered by the court. It is also worthy of note that both of these sections appear as part of an article entitled “Release or Substitution of Sureties on Bond Given in Action or Proceeding.” We think this title makes clear that the ensuing provisions, and not others,
 
 [5]
 
 control how and under what circumstances a surety is released from a court-ordered statutory bond.
 

 Section 995.360 points strongly in the same direction. It provides that a statutory bond “may be withdrawn from the file and returned to the principal
 
 *571
 

 on order of the court
 
 only if one of the following conditions is satisfied: [ID (a) The beneficiary so stipulates, [f] (b) The bond is no longer in force and effect and the time during which the liability on the bond may be enforced has expired.” (Italics added.) This wording is, we think, highly significant. First of all, it makes clear that a court order is required for what is tantamount to the release of a surety, i.e., the withdrawal from the court’s file of its bond. But then it goes further and provides that
 
 this rule obtains even when the beneficiary so stipulates.
 
 Thus the “moral equivalent” of a release signed by the beneficiary, a stipulation signed by him or her, does not obviate the necessity of a court order to get a bond withdrawn from the court’s files. A fortiori the same should be true of a release of the surety signed by the beneficiary.
 
 [6]
 

 Finally, a provision of the Probate Code
 
 [7]
 
 reinforces our conclusion as to the meaning of the Bond and Undertaking Law. That provision is Probate Code section 2335, which provides: “A guardian . . . who applies for a substitution and release of a surety shall file an account with the application. The court shall not order a substitution unless the account is approved.” Admittedly, we are not dealing with an issue involving the substitution of sureties; thus, the quoted statute is not directly applicable. But it does make clear that,
 
 prior to any order approving a substitution and release of a surety, the court must receive and review an accounting.
 
 As discussed above, the necessity for an application and a court order is not because of mere ministerial considerations, but so that the court can make an informed judgment, based on a written accounting, as to whether the beneficiary has been or may be injured. Probate Code section 2335 makes this condition precedent relationship between an accounting and a court order patent.
 
 [8]
 

 We conclude that, under section 996.110 and its related provisions, a court order was required to effectively release respondent USF&G. The release of
 
 *572
 
 August 1991 relied on by the trial court; was not such, and was thus ineffective. The trial court thus erred in ¡granting summary judgment on Carl’s first cause of action.
 

 C., D
 
 *
 

 IV. Disposition
 

 The judgment is reversed as to USF&G with respect to the first cause of action of the first amended complaint; otherwise, it is affirmed. Each party shall bear his or its own costs on appeal.
 

 Kline, P. J., and Ruvolo, J., concurred.
 

 [1]
 

 All. subsequent code section citations are to the Code of Civil Procedure unless otherwise indicated.
 

 [2]
 

 Interestingly, however, the deposition testimony supplied by respondents suggests that the release-without-accounting-or-court-order procedure undertaken here was distinctly out of the ordinary for respondents in a guardianship context.
 

 [3]
 

 There are infinite reasons why it might never want to do so: (a) it prefers to let the principal be discharged at the termination of the guardianship, (b) it has provided a bond of a limited term and duration only, etc., etc.
 

 [4]
 

 This interpretation of the section is supported by the wording of its predecessor provisions. The most recent of these was former section 551 of the Probate Code, enacted in 1931. That section is listed as the historical basis for the current section 996.110, and read in pertinent part: “When a surety of an executor or administrator desires to be released from responsibility on account of future acts, he may make application to the court, or a judge thereof, for relief.” (Stats. 1931, ch. 281, § 551, p. 617.) The predecessor to this section was Code of Civil Procedure section 1403, enacted in 1872, the opening sentence of which was almost exactly the same as that just quoted. The wording of these predecessor provisions rather strongly suggests that, under them, court approval of the release of a surety was not optional. This construction was confirmed in an 1895 case in which our Supreme Court rejected an argument by personal sureties that they should not be liable for the defaults of their principal because of laches. The court said: “If the sureties could not have initiated proceedings to compel the executors to account to the probate court, yet they might have taken proceedings under sections 1403 and 1404 of the Code of Civil Procedure at any time during the administration to procure their release from future responsibility; and, having failed to do so, they are responsible for all derelictions of their principal during his administration of the estate.”
 
 (Biggins
 
 v.
 
 Raisch
 
 (1895) 107 Cal. 210, 213 [40 P. 333].) Implicit if not explicit in this holding is that the original ancestor of the cmrent section 996.110 envisioned, and envisioned only, court approval of the release of a bond which had been originally ordered and approved by the court.
 

 [5]
 

 For this reason, we reject respondents’ contention that section 995.430 is of more significance than section 996.110. The former governs the length of time a bond is normally effective. It is part of an article entitled “Approval and Effect.” We conclude it was not intended to impact on the quite different issue of the release of a surety.
 

 [6]
 

 Yet another provision of the Bond and Undertaking Law implicitly confirms our conclusion that a court order is required to effectively release a surety on a statutory bond. It is section 996.320, a section which appears in Article 13 of the law, the article pertaining, and pertaining only, to nonstatutory bonds. It provides, in contrast to the sections we have been discussing, that a surety on such a bond may simply withdraw from the same “by giving notice of cancellation or withdrawal to the officer to whom the bond was given” as well as its principal. This simple process contrasts starkly with the process mandated by the articles of the same law governing statutory bonds.
 

 [7]
 

 It will be recalled that the provisions of the statute requiring the supplying of a bond govern over the more general provisions of the Bond and Undertaking Law. (See § 995.020, subd. (a) & Prob. Code, § 2320, subd. (c).)
 

 [8]
 

 Section 996.120 of the Bond and Undertaking Law also makes the same thing clear: Although not specifically calling for an “accounting,” it requires a court hearing on the issue of possible “injury to the beneficiary” before the approval of an application for release of a surety under section 996.110, subdivision (a).
 

 *
 

 See footnote,
 
 ante,
 
 page 561.