[No. A079626. First Dist., Div. Two. May 6, 1999.]

STANFORD HORN, Plaintiff and Appellant, v.
CUSHMAN & WAKEFIELD WESTERN, INC., Defendant and
Respondent.

## COUNSEL

McGuinn, Hillsman & Palefsky, Sharon R. Vinick, Ann M. Blessing and John A. McGuinn for Plaintiff and Appellant.

Littler Mendelson, Nancy E. Pritikin, Philip L. Ross and Michael Mankes for Defendant and Respondent.

## OPINION

**KLINE, P. J.—**

### INTRODUCTION

Appellant. Stanford Horn appeals from a judgment of the San Francisco Superior Court dismissing his action for age discrimination and breach of employment contract against respondent Cushman & Wakefield Western, Inc. (hereafter C&W) following the court's grant of C&W's motion for summary judgment. Horn contends the court erred in granting summary judgment. He argues: (1) the trial court erred in weighing the evidence; (2) Horn produced sufficient evidence which would have allowed a jury to infer the reasons given by C&W for his discharge were pretextual; and (3) the

court erred in granting summary judgment on Horn's causes of action for breach of implied contract and breach of the covenant of good faith and fair dealing arising out of his termination. We shall affirm the judgment.

## STATEMENT OF THE CASE

On February 13, 1996, Horn filed a complaint based upon his alleged wrongful termination from C&W. The complaint sought damages for age discrimination in employment; breach of implied contract to terminate only for good cause; and breach of the covenant of good faith and fair dealing. Following discovery in the case, C&W moved for summary judgment. On June 5, 1997, the trial court heard argument on the motion. At the conclusion of the hearing, the trial court adopted its tentative ruling in favor of C&W as to Horn's contract-based causes of action and dismissed those claims. The court took Horn's age discrimination claim under submission. On June 10, 1997, the trial court issued an order granting C&W's motion for summary judgment/summary adjudication, finding no evidence to suggest Horn's termination was motivated by age animus or that C&W's reason for terminating him was pretextual. On July 14, 1997, a formal order granting the motion was filed. A judgment dismissing the action was entered on August 7, 1997. A timely, albeit premature, notice of appeal was filed on July 29, 1997.

## STATEMENT OF FACTS[1]

In June 1990 Horn was hired by C&W, a commercial real estate company, as regional communications manager for the western region. Horn was then 55 years old. Before joining C&W, Horn had worked at Coldwell Banker for 21 years as director of public relations and corporate communications. He had also previously worked for four and one-half years as assistant director of the marketing division at the San Francisco Examiner and then for six and one-half years as advertising and sales promotion manager at two San Francisco radio stations. He held a California real estate license and a master's degree in journalism.

Horn was hired by C&W's regional president John Renard[2] and Horn reported directly to Renard. During his employment with C&W, Horn's

---

[1]Additional facts are set forth as necessary in our discussion of the issues.

[2]Horn disputes that Renard hired him, pointing out that he was interviewed on several occasions by various managers at C&W, including C&W's personnel manager, five resident managers of C&W's Northern California offices, C&W's head of corporate communications in New York, and Renard. However, it is undisputed that Renard—Horn's direct supervisor and the person with whom Horn was to work most closely—was the last person to interview

performance evaluations, all written by Renard, were positive. On three of the four evaluations (including the last two), Horn's work was evaluated as "exceeds expectations" which was defined as: "demonstrates definable above average performance in most areas of the job. Frequently exceeds and always meets the established objectives and standards of the job." However, those same evaluations suggested that Horn "be more creative and more assertive in his dealings," that greater effort be made to "involve him more as a problem solver in the advertising, communications and p.r. arena" as well as in "exclusive marketing projects," and that he "exhibit greater initiative through active participation in challenging assignments." Horn received numerous commendations for his work at C&W, including written commendations from Renard, the chief operating officer, the San Francisco branch manager, local office managers and sales people, and others. The San Francisco Examiner described the manner in which Horn related to the press as "the most professional approach to real estate public relations in California." He had a very good working relationship with Renard.

In 1994, C&W undertook a company-wide reorganization by changing from a branch office concept to a market area concept. The change was designed to provide a seamless point of contact for the company's clients and was intended to make C&W more user friendly and responsive to its clients' needs. As of January 1994, although still reporting directly to Renard, Horn also began reporting indirectly to Barbara Van Allen, the newly hired national communications director for C&W, who was stationed in New York. As a result of the reorganization, 10 to 12 members of C&W's management team were terminated. In October 1994 Horn prepared a news release regarding the reorganization, which was approved by Renard and by C&W's East Coast offices. After Horn circulated the news release to the press, a local business newspaper ran a story about C&W's reorganization, using phrases such as "blood flows in the hallways at Cushman and Wakefield" and "heads are axed." Horn saw the story early that evening. He sent a copy of it to Van Allen by overnight courier, so that it would arrive by 9:00 a.m. the next morning. Before it reached her, Van Allen heard about the story from one of her bosses. When Horn arrived at work the next morning, he received a call from Van Allen, who told him that before 9:00 a.m. someone asked her about the story, and she was very embarrassed because she had not seen it. When Horn explained he had sent the story to her by overnight mail, Van Allen replied, "[t]his is 1994, haven't you ever heard of a fax before?"

Horn at a one-on-one breakfast meeting; that shortly thereafter Horn went to C&W for a meeting with Renard (at which another person may have been present) at which Horn understood an offer was to be made; and that a verbal offer was made at that time by Renard. We believe that although others may have been involved in the process, the undisputed evidence establishes that Renard hired Horn.

Consistent with the goals of the reorganization, Renard decided to restructure the regional communications manager position by changing the position's focus from internal communications to external communications and public relations. Renard considered Horn for the restructured position, but concluded that Horn's skills and abilities were not the most suitable for the position. Renard believed that Horn was more of a "technician" than a "salesman." According to Renard, "Stan did a job which met expectations, sometimes exceeded expectations, but we had a different vision going forward, and we were looking for somebody who was really going to stand out in that particular area, and Stan very candidly never stood out as an outstanding marketing individual." Renard had in mind someone with stronger sales and marketing skills who could effectively work with brokers and market the company. He did not ask Horn about his experience in marketing and sales.

Van Allen and Renard discussed Horn's performance on 3 to 10 different occasions within the 60 to 90 days before Horn was terminated. Van Allen and Renard discussed with what she termed Horn's "lack of urgency" and "lack of a strategic focus" and "lack of sensitivity to the marketplace" and to the "client-driven nature of Cushman and Wakefield" that the company was moving toward.

Renard sought Van Allen's input on the restructuring of the position and Horn's termination, but he made the decision himself. Van Allen concurred.

On December 5, 1994, Renard informed Horn he was terminated, effective January 31, 1995. Referring to a memo prepared by the human resources department, Renard told Horn that his termination was a result of the changes that were occurring in the company and that the functions of the regional communication manager's position were being reorganized. Horn reacted by stating to Renard, "It's been a good five-year run." Horn was then 59 years old. Renard was 56 years old at the time he made the decision to terminate Horn.

After Horn was terminated, C&W sought to fill the restructured position. Approximately 10 individuals were interviewed for the job. On August 1, 1995, 38-year-old Gary Marsh was hired for the position of regional communications manager. Marsh had two years' recent experience as a reporter covering, among other things, real estate news and had nearly seven years' experience in sales and marketing.

DISCUSSION

I.

*Age Discrimination*

A. *The law.*

Summary judgment is properly granted when there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) ■ A defendant seeking summary judgment bears the initial burden of proving the "cause of action has no merit" by showing that one or more elements of plaintiff's cause of action cannot be established or there is a complete defense. (Code Civ. Proc., § 437c, subds. (a), (o)(2); *Addy* v. *Bliss & Glennon* (1996) 44 Cal.App.4th 205, 213 [51 Cal.Rptr.2d 642]; *Martin* v. *Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1730-1731 [35 Cal.Rptr.2d 181].) Once the defendant's burden is met, the burden shifts to the plaintiff to show that a triable issue of fact exists as to that cause of action. (*Ibid.*)

■ "This court reviews de novo the trial court's decision to grant summary judgment and we are not bound by the trial court's stated reasons or rationales. (*Prilliman* v. *United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 951. . . .)" (*Hersant* v. *Department of Social Services* (1997) 57 Cal.App.4th 997, 1001 [67 Cal.Rptr.2d 483] (*Hersant*).) We accept as true the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them. (*Ibid.*) However, to defeat the motion for summary judgment, the plaintiff must show " 'specific facts,' " and cannot rely upon the allegations of the pleadings. (*Ibid.*; *Snyder* v. *United States Fidelity & Guarantee Co.* (1997) 60 Cal.App.4th 561, 565 [70 Cal.Rptr.2d 498].)

Federal and state law both prohibit employers from discriminating against employees on the basis of age. (Gov. Code, § 12941, subd. (a); 42 U.S.C. § 2000e et seq.; 29 U.S.C. § 621 et seq.)[3]

■ As with actions under federal antidiscrimination legislation, a plaintiff alleging discriminatory termination under California's antidiscrimination statutory scheme must be able to survive the burden-shifting analysis set

---

[3]Although state and federal laws concerning age discrimination differ in some respects, their objectives are identical. California courts look to the federal law as a guide to analysis of claims under the California act because the statutes are similar. (*Hersant, supra,* 57 Cal.App.4th at p. 1002, fn. 1; *Stephens* v. *Coldwell Banker Commercial Group, Inc.* (1988) 199 Cal.App.3d 1394, 1399 [245 Cal.Rptr. 606].)

forth by the Supreme Court in *McDonnell Douglas Corp.* v. *Green* (1973) 411 U.S. 792, 802-804 [93 S.Ct. 1817, 1824-1825, 36 L.Ed.2d 668] (*McDonnell Douglas*). (*Caldwell* v. *Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 195-196 [48 Cal.Rptr.2d 448].) By applying *McDonnell Douglas*'s shifting burdens of production in the context of a motion for summary judgment, "the judge [will] determine whether the litigants have created an issue of fact to be decided by the jury." (*Texas Dept. of Community Affairs* v. *Burdine* (1981) 450 U.S. 248, 255, fn. 8 [101 S.Ct. 1089, 1094, 67 L.Ed.2d 207].)

"The burden-shifting system requires the employee first establish a prima facie case of age discrimination. If the employee does so, the employer is required to offer a legitimate non-age-based reason for the adverse employment action. If it does not, then the employee prevails. [Citations.]" (*Hersant, supra,* 57 Cal.App.4th at p. 1002.)

"When the employee has made this showing, the burden shifts to the employer to go forward with evidence that the adverse action was based on considerations other than age discrimination. When the employer offers evidence justifying the adverse action on a basis other than age, the burden shifts back to the employee to meet his ultimate obligation of proving that the reason for the adverse action was age discrimination. This ultimate issue is decided on all the evidence. [Citations.]" (*Hersant, supra,* 57 Cal.App.4th at p. 1003.) California courts have disagreed upon the exact showing required by an employee to avoid summary judgment in the face of evidence by an employer of a non-age-based reason for an adverse action. (*Id.* at p. 1003.)[4] ▮ However, "the predominant view" adopted by *Hersant* (*ibid.*), with which we agree, is that "to avoid summary judgment, an employee claiming discrimination must offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer. acted with a discriminatory

---

[4]As described in *Hersant,* this disagreement stems from somewhat contradictory language contained in *St. Mary's Honor Center* v. *Hicks* (1993) 509 U.S. 502 [113 S.Ct. 2742, 125 L.Ed.2d 407]. "[C]ourts and commentators have considered the *Hicks* opinion and have come to varying conclusions concerning its meaning. Some have concluded an employee's prima facie case, even in the face of an employer's showing of a non-age-based reason for the adverse action, is alone sufficient to avoid summary judgment. Others have concluded *Hicks* requires the employee, once the employer has offered its nondiscriminatory reason, show both that the reason is false and that the true reason for the adverse action was a discriminatory animus. What has been described as the predominant view, however, is somewhere in between and requires the employee rebut the employer's stated nondiscriminatory reason with substantial evidence of its falsity or present other evidence suggesting a discriminatory basis, or some combination of the two such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination." (*Hersant, supra,* 57 Cal.App.4th at p. 1004, citing 1 Lindemann & Grossman, Employment Discrimination Law (3d ed. 1996) pp. 23-27.)

animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination." (*Id.* at pp. 1004-1005; accord, *Martin* v. *Lockheed Missiles & Space Co., supra,* 29 Cal.App.4th 1718, 1735.)[5]

Nor can the employee simply show the employer's decision was wrong, mistaken, or unwise. Rather, the employee " 'must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," [citation], and hence infer "that the employer did not act for the [. . . asserted] non-discriminatory reasons." [Citations.]' [Citations.]" (*Hersant, supra,* 57 Cal.App.4th at p. 1005.)

### B. *Burden shifting applied.*

 Here, the parties concede that Horn has made a prima facie case. Thereafter, C&W met its initial burden of producing substantial evidence of a legitimate, nondiscriminatory reason for Horn's termination—the position was restructured and Renard believed that Horn was not the best fit for the restructured position. At that point the presumption of unlawful discrimination "simply drops out of the picture." (*St. Mary's Honor Center* v. *Hicks, supra,* 509 U.S. 502, 511 [113 S.Ct. 2742, 2749].)

Consequently, the burden shifted to Horn to "produce 'substantial responsive evidence' that the employer's showing was untrue or pretextual. [Citation.]" (*Martin* v. *Lockheed Missiles & Space Co., supra,* 29 Cal.App.4th at p. 1735; see also *University of Southern California* v. *Superior Court* (1990) 222 Cal.App.3d 1028, 1035-1036 [272 Cal.Rptr. 264].) "To avoid summary judgment, [appellant] 'must do more than establish a prima facie case and deny the credibility of the [defendant's] witnesses.' [Citation.] [He] must produce 'specific, substantial evidence of pretext.' [Citation.]" (*Bradley* v. *Harcourt, Brace and Co.* (9th Cir. 1996) 104 F.3d 267, 270.) We emphasize that an issue of fact can only be created by a conflict of evidence. It is not created by speculation or conjecture. (See *Compton* v. *City of Santee* (1993) 12 Cal.App.4th 591, 595-596 [15 Cal.Rptr.2d 660].) We review the evidence presented to the trial court and independently adjudicate its effect as a matter of law. (*Lee* v. *Crusader Ins. Co.* (1996) 49 Cal.App.4th 1750, 1756 [57 Cal.Rptr.2d 550].)

*1.* As an initial matter, we reject Horn's assertion that the trial court engaged in prohibited weighing of the evidence. Horn's assertion is based on

---

[5]We reject Horn's assertion that something less than "substantial evidence" is "sufficient" to demonstrate pretext.

remarks made by the trial court during the summary judgment hearing. Nothing in the order granting summary judgment indicates the court based its grant of summary judgment on its weighing of the evidence or upon other than proper considerations. Moreover, we review the determination of the court, not its rationale. (*Prilliman* v. *United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 951 [62 Cal.Rptr.2d 142]; *Hersant, supra,* 57 Cal.App.4th at p. 1001.)[6]

■ *2.* Horn asserts that the actual force behind his termination was Van Allen and not Renard and that Van Allen harbored discriminatory animus toward Horn because of his age. Both assertions are entirely speculative. Horn refers to evidence that Renard had discussions with Van Allen about Horn 60 to 90 days before Horn was terminated and that Renard and Van Allen had between 3 to 10 discussions regarding Horn's "lack of urgency, lack of strategic focus" and his "lack of sensitivity to the marketplace, the client driven nature of Cushman & Wakefield . . . ." These facts are undisputed. They do not provide substantial evidence from which one could infer that Van Allen made the decision to terminate Horn in view of Renard's clear testimony that he made the decision.

Renard testified that he made the decision to restructure the position and to fire Horn. Renard testified he had sought Van Allen's input prior to making his recommendation and shared his recommendation with both Van Allen and the chief operating officer of the company, Anthony Seranni. Renard stated Van Allen was generally in agreement with Renard's recommendation that Horn should be terminated. Renard acknowledged that there were several instances in which Van Allen was very much concerned with Horn's performance. Nevertheless, Renard was clear that it was his decision that Horn was not suitable for the restructured position and it was his decision to fire Horn. Van Allen testified she concurred with Renard's

---

[6]Cases cited by Horn reversing summary judgment where the trial court engaged in weighing the evidence are inapposite as the trial court in each case ignored or discounted substantial evidence of pretext. (See, e.g., *Chipollini* v. *Spencer Gifts, Inc.* (3d Cir. 1987) 814 F.2d 893, 900, cert. den. 483 U.S. 1052 [108 S.Ct. 26, 97 L.Ed.2d 815] ["In opposing the summary judgment motion Chipollini presented specific evidence which supports his position that the defendant's proffered reason is unworthy of credence. This evidence, if credited by the factfinder at trial, would be sufficient to meet Chipollini's burden to counter the defendant's reasons as pretextual . . . ."]; *Sempier* v. *Johnson & Higgins* (3d Cir. 1995) 45 F.3d 724, 731 [district court ignored evidence that the plaintiff had never received criticism or unsatisfactory performance evaluations and that he was being coerced to retire under an early retirement program]; *Schnidrig* v. *Columbia Machine, Inc.* (9th Cir. 1996) 80 F.3d 1406, 1411 [On three separate occasions, the plaintiff was told the board wanted somebody younger for the job. The plaintiff did more than offer mere allegations of discriminatory intent; he "produced evidence in the form of shorthand notes taken at the February 25, 1992, Board meeting and the affidavit of a coworker."]; *Patrick* v. *Le Fevre* (2d Cir. 1984) 745 F.2d 153, 160 [sincerity of inmate's religious beliefs was a material issue of disputed fact].)

suggestion regarding the restructuring of the position to make it more client driven, more marketing and sales driven and with the need to find an externally focused individual. She stated Horn was terminated because of the general desire that Renard had, which she shared, that the company needed to move in a different direction. She and Renard also testified that Horn reported directly to Renard. Horn had only "dotted line" or indirect reporting responsibility to Van Allen.

The relevance of who made the decision to terminate Horn is twofold.

First, ". . . where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive." (*Bradley* v. *Harcourt, Brace and Co., supra,* 104 F.3d 267, 270-271; accord, *Proud* v. *Stone* (4th Cir. 1991) 945 F.2d 796, 797; *Lowe* v. *J.B. Hunt Transport, Inc.* (8th Cir. 1992) 963 F.2d 173; *Buhrmaster* v. *Overnite Transp. Co.* (6th Cir. 1995) 61 F.3d 461, 464; but see, *Waldron* v. *SL Industries, Inc.* (3d Cir. 1995) 56 F.3d 491, 496, fn. 6 [refusing to apply the presumption, instead considering this fact to be evidence of nondiscrimination].) As observed by the Fourth Circuit: "One is quickly drawn to the realization that '[c]laims that employer animus exists in termination but not in hiring seem irrational.' From the standpoint of the putative discriminator, '[i]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job.' " (*Proud* v. *Stone, supra,* 945 F.2d 796, 797.)[7]

Second, as Van Allen did not make the decision to terminate Horn, her isolated remark to him concerning the fax machine (which appears highly ambiguous as far as discriminatory animus and which was not made in the context of Horn's termination) was at most a "stray" ageist remark and is entitled to virtually no weight in considering whether the firing was pretextual or whether the decisionmaker harbored discriminatory animus. (Lindemann & Grossman, Employment Discrimination Law (3d ed., 1998 supp.) pp. 231-232; e.g., *Merrick* v. *Farmers Ins. Group* (9th Cir. 1990) 892 F.2d

---

[7]Horn argues the same actor inference is inapposite because five years passed between the time of hiring and firing and the presumption only applies, if at all, where the termination occurs within a relatively short time after the hiring. While many of the cases applying the inference involve hirings and firings occurring in a span of two years or less (e.g., *Proud* v. *Stone, supra,* 945 F.2d 796 [six months]; *Bradley* v. *Harcourt, Brace and Co., supra,* 104 F.3d 267 [one year]; *Lowe* v. *J.B. Hunt Transport, Inc., supra,* 963 F.2d 173 [less than two years]), others apply the presumption in circumstances where employment has lasted a longer time. (See *Buhrmaster* v. *Overnite Transp. Co., supra,* 61 F.3d 491 [seven and one-half years]; *Brown* v. *CSC Logic, Inc.* (5th Cir. 1996) 82 F.3d 651, 658 [four years].) In light of the foregoing, we conclude five years is a relatively short time and is not so long a time as to attenuate the presumption.

1434, 1438 ["Comments suggesting that the employer may have considered impermissible factors are clearly relevant to a disparate treatment claim. [Citations.] [¶] On the other hand, 'stray' remarks are insufficient to establish discrimination. [Citations.]"]; *Gagne* v. *Northwestern Nat. Ins. Co.* (6th Cir. 1989) 881 F.2d 309, 314-316 ["single, isolated discriminatory comment" by plaintiff's immediate supervisor was insufficient to trigger burden shift or to avoid summary judgment for defendant]; *Smith* v. *Firestone Tire and Rubber Co.* (7th Cir. 1989) 875 F.2d 1325, 1330 [stray "remarks, . . . when unrelated to the decisional process, are insufficient to demonstrate that the employer relied on illegitimate criteria, even when such statements are made by the decision-maker in issue"].)

Although providing a strong inference of nondiscrimination, the same-actor presumption is not irrebuttable. (See *Brown* v. *CSC Logic, Inc.*, *supra*, 82 F.3d 651, 658.)

3. Horn contends he produced substantial evidence indicating that the proffered explanation for his termination was pretextual and that this evidence was sufficient to overcome the presumption and to preclude summary judgment. Specifically, Horn argues that he introduced substantial evidence that the job position was not in fact restructured and that C&W gave inconsistent reasons for restructuring the position and for terminating him. He further argues summary judgment was improper because the state of mind of his superiors Renard and Van Allen was at issue.

Horn relies primarily upon written position summaries and the more detailed job descriptions for the position both before and after the asserted restructuring, the job announcement placed by C&W in the San Francisco Business Times in March 1995, a written memo prepared by Horn to Van Allen describing his job duties, his declaration and deposition testimony describing his job duties, Marsh's deposition testimony concerning the job duties, and parts of the depositions of Van Allen and Renard.

The principal responsibilities outlined in the "Position Description" under which Horn performed and the one prepared for the restructured position are very similar, as are "Position Summary" portions of those descriptions. Renard affirmed that the principal responsibilities listed were accurate. However, both Renard and Van Allen testified the actual focus of the job was altered and redirected toward what Van Allen described as external communications and Renard described as marketing and media relations rather than to internal communications (in other words, the focus changed to one more marketing and sales driven). Horn notes that eight of the principal responsibilities found in the job descriptions are the same. However, there

are additional principal responsibilities contained in the revised description that are not found in Horn's job description. One new requirement of significance is that the regional communications manager "[p]repares strategic publicity plan for each of the markets in the region, working with the respective local public relations agencies." Another listed principal responsibility is that the regional communication manager "[s]erves as a member of the C&W Corporate Communications team and keeps the Managing Director, Corporate Communications abreast of major communications initiatives and activities in the region. Ensures that media relations, advertising and other marketing communications efforts are coordinated to match the Corporate Communications strategic plan for C&W." (Renard recognized that Horn was asked to and did prepare a strategic publicity plan during his employment.)

As the trial court observed, that the written position description does not change does not mean the employer has not restructured the job. The question is whether the similarities of the job descriptions, together with other evidence presented by Horn, provides substantial evidence of pretext sufficient to overcome the strong inference of nondiscrimination raised by the same-actor presumption. We think not. As we explain hereafter, it is the focus of the actual job duties required, rather than the position description which is relevant.

Nor does the March 1993 "Written Plan" prepared by Horn and describing his principal activities for Van Allen provide substantial evidence that the restructuring was pretextual. The variety of activities Horn describes himself as performing include several activities that have been termed "external communications" activities by C&W, such as "press relations," "news releases" and "feature stories," and seeking speaking forums for C&W personnel. However, other activities listed, such as producing employee meetings, researching, writing, editing and producing the monthly newsletter, formulating regional awards program, and providing editing critiques for C&W personnel, are clearly internal communications. The Written Plan prepared by Horn does not give a picture of the amount of time spent on any particular task and does not indicate that the "focus" of the job did not change during its restructuring. In fact, at his deposition, Horn indicated that he spent very little time on feature stories (estimating two per year) whereas it is clear that he spent a great deal of time and effort on the internal company newsletter—a document that was discontinued after Horn's termination.

The ad for the regional communications manager position appeared in the San Francisco Business Times on March 9, 1995. It stated in relevant part:

"Dynamic individual needed to spearhead public relations/communications program for the Western U.S. Required credential: BA in Communications or related field (MBA a plus). Also required: Candidate must be self-motivated, creative and enthusiastic. Responsible for maintaining contacts with local media, and working as a team with brokers and management to create marketing materials. Commercial real estate expertise a plus. Some travel required." This one-paragraph ad does not advance Horn's claim of pretext. Indeed, the absence of any reference to internal communications responsibilities and the focus on spearheading the company's public relations and communications program with its emphasis on media contacts and marketing, if anything, lends support to C&W's assertion the job had been refocused toward external communications.

The relevant inquiry is whether the focus of the *actual* duties required and performed by the regional communications manager has changed.[8] The record on summary judgment shows that Marsh's job responsibilities differed substantively from Horn's responsibilities, shifting focus away from internal communications to external communications and public relations. Although Marsh did some work which could be termed internally focused, and Horn had done some with a more external focus, the balance was dramatically changed after restructuring. Asked to describe his responsibilities, Horn listed the following: writing speeches for Renard (one or two per year); working on the company newsletter; assisting salespeople and management with executive writing; preparation of press releases (approximately one per week); traveling across the country to inform management and employees "what we were up to and see how we could be of assistance to them"; very little time spent writing feature stories (maybe two per year); planning company meetings (approximately two per year); preparation of ads, primarily for the sale or lease of properties; interviewing and hiring outside public relations firms. The majority of these activities pertain to internal communications. This is consistent with Renard's testimony that in 1994, Horn spent a great deal of time on the in-house periodical WestWords and in doing other things such as writing speeches for Renard and "seemed to be less accessible to our brokers on request. . . ."

In contrast, Marsh's description of his work week as regional communications manager demonstrates he primarily performed responsibilities relating to external communications. His primary function was to deal

---

[8]See, e.g., *Patkus* v. *Sangamon-Cass Consortium* (7th Cir. 1985) 769 F.2d 1251, 1260 (equal pay analysis turns on actual duties involved rather than on language in job descriptions); and *Hall* v. *U.S. Postal Service* (6th Cir. 1988) 857 F.2d 1073, 1079-1080 (question whether a job duty is an "essential function" of the job for purposes of reasonably accommodating a disability does not turn upon the job description, but the actual functioning of the position).

externally with the media, developing and pitching story ideas promoting C&W. He bought media placements, which he described as determining "which publications, or radio or television stations to advertise in." Marsh also spent time formulating advertisements and arranging public relations activities. He spent time developing the themes and messages for C&W's advertising and promotion. Copywriting was done mostly out of New York. He would also involve C&W in business development events. Only occasionally, or from time to time, did he contribute to internal communications vehicles. As part of the restructuring of the position, C&W discontinued WestWords, the internal communication that Horn had initiated and prepared.

Nor does our review of the record support Horn's assertion that C&W gave "ever-changing reasons" for terminating him. C&W's reasons have remained consistent. When Renard initially informed Horn of the termination decision, he explained that as a result of the changes going on within the company, the functions of the regional communications manager's position were being reorganized. The notes Renard referenced during his meeting stated in relevant part: "Our focus is different today from where it was four or five years ago and the necessary skill sets required of certain professionals is different. During the time you have been with Cushman & Wakefield, the contributions you have made relative to internal communications have been effective. However, with the impending demise of WestWords and the need to focus on a strong external communications and public relations program, the business decision has been made to terminate your employment as of January 31, 1995." Renard testified during his deposition that the reason Horn had been fired was because the C&W had recently been through a major restructuring and had determined to restructure the geographical area away from the branch office concept to a marketing area concept, "we were attempting to make ourselves user-friendly, more responsive to our clients, and that meant getting out in the various communities which were now addressed not as branches but as marketing areas and telling the Cushman & Wakefield story to both our clients and to potential clients of the firm." It was felt that "consistent with that charted direction and the change that would take place it was determined that Stan was not the most appropriate fit going forward." "It was felt that Stan's strengths or characteristics which played a part in making contributions to the Company while he was employed were not the most suitable ones insofar as the direction of the company was concerned, and that involved taking a more assertive and proactive role in the communities that we were now opening up on an area concept basis." "We wanted somebody with more marketing skills, sales ability in working with the brokers, somebody who could help sell Cushman & Wakefield better than Stan did."

Van Allen's explanation was consistent with this. She concurred with Renard's suggestion that the regional communication manager's position be restructured "in conjunction with a reorganization to make ourselves more client-driven, more aligned with what the marketplace seemed to want, that we redefine the communications position." She acknowledged that "a more marketing, sales kind of driven, externally-focused individual would be worth looking for." When asked what was different about the position after it was restructured, she responded that it was "[m]ore of a strategic focus, more externally focused. [¶] . . . [¶] More emphasis on the various audiences outside the employee base of the company. [¶] . . . [¶] That would be reporters, clients, potential clients, industry groups, government officials."

Taking her words out of context, Horn argues Van Allen's explanation was inconsistent with that given by Renard and C&W's counsel. He claims she testified that the position "restructuring was designed to implement central management and to have the Regional Communications Manager position have '[m]ore of a strategic focus.'" Van Allen in fact testified that the company-wide reorganization—not the position restructuring—was designed to "implement central management." Moreover, as quoted above, she testified the position was not restructured simply to have "more of a strategic focus," but that the strategic focus was to be "more externally focused" on audiences outside the employee base of the company. In context, her testimony is entirely consistent with that of Renard and with the letter by C&W's counsel, Nancy Pritikin, to Horn's counsel.[9] That letter stated: "[E]mphasis of the position was refocused from internal communications to external communications, including media relations. In addition to the job responsibilities discussed above, under the restructured position, the Regional Communications Manager also was expected to prepare a strategic publicity plan for each market in the region and to ensure that media relations, advertising and other marketing communications efforts were coordinated to match C&W's strategic plan. [¶] Based on Mr. Horn's prior performance, he could not perform the responsibilities of the restructured position. . . ."

---

[9]C&W objects here, as they did below, to Horn's reference to this letter. The letter was in response to Horn's counsel's request that alternative dispute resolution forums be explored and addressed C&W's willingness to pursue a possible early resolution of the dispute. C&W claims Pritikin's statements therein constitute statements made as a part of settlement negotiations and are therefore inadmissible to prove liability. (See Evid. Code, § 1152.) Although we do not view the letter as statements made in the negotiation of a compromise or settlement, we also do not view the statements therein as inconsistent with the reasons given by C&W for Horn's termination.

Specific criticisms of Horn contained in that letter relating to his performance are consistent with Renard's evaluation of Horn's performance.[10] Primary performance issues referenced in the letter are that Horn did "not take a great deal of initiative on the job," and that "[h]e was not aggressive in pursuing media relations." Renard testified: "Stan did a job which met expectations, sometimes exceeded expectations, but he had a different vision going forward, and we were looking for somebody who was really going to stand out in that particular area, and Stan very candidly never stood out as an outstanding marketing individual." "He was not a marketing person. He never demonstrated those skills at Cushman & Wakefield . . . . There were certain things that he did well that served the company well, but moving forward in the aggressive, proactive fashion that we needed to and breaking down the artificial barriers, the geographical barriers that previously existed at the company, Stan was not going to be as suitable and as strong in those areas as others."

The statements of Renard, Van Allen, and Pritikin contain the same central theme—that the responsibilities of the position were restructured to require greater focus on external communication and marketing concerns and that Horn was not viewed as being the strongest person for the task. Neither the use of somewhat different language by each of the three to articulate this reason nor individual additional criticisms of Horn's job performance take away from the consistency of the justification. It is the substance of the reason provided, not the word choice, which is critical. (*Rand* v. *CF Industries, Inc.* (7th Cir. 1994) 42 F.3d 1139, 1146 [citation of isolated portions of the record in an attempt to show inconsistency fails where review of the cited testimony reveals that—in substance if not word choice—there is unanimity]; see *Nidds* v. *Schindler Elevator Corp.* (9th Cir. 1996) 113 F.3d 912, 918 [Reasons given by employer for termination are "not incompatible, and therefore not properly described as 'shifting reasons.'" "Lack of work" and "lack of seniority and poorer performance relative to other mechanics" are not incompatible and are insufficient to raise a genuine issue of fact as to whether employer's reasons for layoff were pretextual.].)

Horn further contends that Renard gave a disingenuous explanation for not considering Horn for the restructured position as Horn was amply qualified. Horn possessed a real estate sales license and over 11 years of experience in

[10]Horn contends for the first time on this appeal that Pritikin's letter is evidence of pretext, as it allegedly contains unwarranted criticism of his job performance. Because this fact based contention was raised for the first time in appellant's opening brief, we shall not consider it. (*Mattco Forge, Inc.* v. *Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 847 [60 Cal.Rptr.2d 780]; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 1998) ¶ 8:229, pp. 8-106 to 8-107.)

marketing, sales promotion and advertising before joining Coldwell Banker (his previous employer) in 1969. During his 21 years at Coldwell Banker, he worked closely with "a whole generation of San Francisco's top commercial real estate sales and leasing brokers" and "handled comprehensive sales and lease development programs during the City's biggest office expansion phase. For instance, together with them I created sales and leasing brochures for such landmark buildings as Embarcadero Center, West Coast Life, the California State Automobile Association headquarters, the State Compensation Insurance Fund headquarters, 101 California, 580 California, 456 Montgomery, 100 Pine and many others." In short, Horn asserts he had a background in sales and marketing superior to that of Marsh and that Renard's failure to inquire into his qualifications for the restructured position provides evidence of pretext. We disagree.

Initially, we point out that an employee's subjective personal judgments of his or her competence alone do not raise a genuine issue of material fact. (*Bradley* v. *Harcourt, Brace and Co., supra,* 104 F.3d 267, 270.)

Renard testified he did not ask Horn about his sales background when considering whether to restructure the position. However, Renard's determination that Horn's marketing skills and sales abilities were not adequate for the restructured position was based on Renard's observation of Horn during his tenure at C&W and Renard's belief that Horn had not sufficiently demonstrated these skills at C&W. As Renard explained, "[Horn's] marketing skills, his sales abilities were very much limited in my opinion as compared to the type of person that I envisioned in that role. [¶] . . . [¶] . . . [H]e had no background or experience in that arena to the best of my knowledge, and he clearly did not demonstrate very much assertiveness while in the job." Renard explained that Horn was more a "technician very capable in some respects" but Renard did not believe him "to be as suitable and as strong in certain marketing and sales areas as others." Horn reported directly to Renard and Renard's firsthand observation of Horn's performance for a period of four and one-half years furnished Renard with a sufficient basis to make these evaluations without inquiring into Horn's previous experiences. (*Merrick* v. *Farmers Ins. Group, supra,* 892 F.2d 1434, 1438.) Horn himself confirmed this judgment when he testified in response to a question as to whether he had ever tried to find work using his real estate salesperson's license that "I don't consider myself to be a good salesman or a good broker." He qualified that answer somewhat by saying, "not that I say I wouldn't be a good one, but that is not my primary interest or where my primary skills lie . . . ."

In sum, Horn has failed to produce substantial evidence that the reasons given by C&W for his termination were either "ever-shifting" or disingenuous.

Finally, we reject Horn's argument that summary judgment should have been denied because the case turns on the state of mind of Renard and Van Allen. The decisionmaker's motive and state of mind will almost always be in dispute in such cases. However, as recognized in numerous cases, the plaintiff " 'must do more than establish a prima facie case and deny the credibility of the [defendant's] witnesses.' " (*Wallis* v. *J.R. Simplot Co.* (9th Cir. 1994) 26 F.3d 885, 890, quoting *Schuler* v. *Chronicle Broadcasting Co.* (9th Cir. 1986) 793 F.2d 1010, 1011; accord, *Bradley* v. *Harcourt, Brace and Co., supra,* 104 F.3d at p. 270; *Lindahl* v. *Air France* (9th Cir. 1991) 930 F.2d 1434, 1437-1438 ["The plaintiff cannot carry this burden simply by restating the prima facie case and expressing an intent to challenge the credibility of the employer's witnesses on cross-examination. She must produce specific facts either directly evidencing a discriminatory motive or showing that the employer's explanation is not credible."].)

Because Horn did not produce substantial evidence that C&W's proffered reasons were pretexts for an improper discriminatory motive, we affirm the grant of summary judgment on the age discrimination claims.

## II.

### *Breach of Implied Contract*

The trial court granted summary judgment for C&W on Horn's cause of action for breach of implied contract. C&W relied upon the presumption of Labor Code section 2922 that employment is "at will" where it is not for a specified term and the statement in C&W's employee brochure that the company's relationship with its employees is "based upon the will of both parties and may be terminated at the will of either party, unless there is a written agreement to the contrary."

Horn contends the trial court erred in granting summary judgment on his cause of action for breach of implied contract. He asserts he produced substantial evidence of an implied-in-fact agreement requiring good cause for termination by presenting evidence of the following: He received regular, merit-based salary increases; he received favorable annual performance evaluations, with three of the four evaluations rated as "exceeds expectations"; and the text of his last two performance evaluations contained statements which, he contends, could be construed as assurances of continued employment. In evaluating Horn for the 1992 calendar year, Renard described him as an "intellectually curious employee whom I feel has his best days of performance ahead of him at C&W." In his evaluation for 1993, Renard stated, "Stan has the necessary knowledge and capabilities of playing a key role in our future."

We agree with the trial court that the foregoing evaluations do not raise a triable issue of fact as to the "at will" nature of Horn's employment. Because it is directly on point, we quote at length from the Fourth Appellate District's opinion in *Kovatch v. California Casualty Management Co.* (1998) 65 Cal.App.4th 1256 [77 Cal.Rptr.2d 217], upholding summary adjudication on the issue of the existence of an implied-in-fact contract.

"Generally, the existence of an implied-in-fact contract requiring good cause for termination is a question for the trier of fact; however, if only one reasonable conclusion can be drawn from the undisputed facts, the issue may be decided as a matter of law on summary judgment. [Citations.] Here, [appellant] contends there was a triable issue of fact as to whether his employment . . . was at will or terminable only for cause. For the reasons that follow, we disagree.

"We begin with the applicable statutory law, found in the Labor Code: 'An employment, having no specified term, may be terminated at the will of either party on notice to the other.' (Lab. Code, § 2922.) ▪ 'Labor Code section 2922 establishes a presumption of at-will employment if the parties have made no express oral or written agreement specifying the length of employment or the grounds for termination. This presumption may, however, be overcome by evidence that despite the absence of a specified term, the parties agreed that the employer's power to terminate would be limited in some way, e.g., by a requirement that termination be based only on "good cause." [Citations.]' (*Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 677 . . . .) 'In the employment context, factors apart from consideration and express terms may be used to ascertain the existence and content of an employment agreement, including "the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged." ' (*Id.* at p. 680, quoting *Pugh* v. *See's Candies, Inc.* (1981) 116 Cal.App.3d 311, 327 . . . .)" (65 Cal.App.4th at pp. 1275-1276.)

"As the parties seeking summary judgment, defendants had the initial burden of proving [the appellant] was an at-will employee. (See Code Civ. Proc., § 437c, subd. (o)(2).)" (*Kovatch* v. *California Casualty Management Co., supra*, 65 Cal.App.4th at p. 1276.) To meet that burden, defendants relied on the presumption of at-will employment established by Labor Code section 2922, and also offered evidence that in applying for employment with the company, the appellant had agreed his employment could be terminated " 'with or without any cause, at any time . . . .' " (65

Cal.App.4th at p. 1276.)[11] Defendants also offered evidence that the company's employee handbook, which the appellant acknowledged receiving, "provided for termination 'at any time and for any reason.' " (*Ibid.*)

"Because defendants' evidence was sufficient to prove [the appellant] was an at-will employee, the burden shifted to [the appellant] to show the existence of a triable issue of fact as to his employment status. (See Code Civ. Proc., § 437c, subd. (o)(2).) [The appellant] offered evidence that throughout his five years of employment with [the company], he had received positive performance reviews, commendations from his superiors, and salary increases. He also offered evidence of various statements made to him over the years by various supervisory employees in which they allegedly assured him he had a future with the company and undoubtedly would become a sales manager.

■ "In our view, [the appellant's] evidence of positive performance reviews, commendations, salary increases, and vague assurances that he would become a sales manager was not sufficient to create a triable issue of fact as to whether the parties had implicitly agreed [the company's] right to terminate [him] would be limited. Most of those factors are 'natural occurrences of an employee who remains with an employer for a substantial length of time.' (*Miller* v. *Pepsi-Cola Bottling Co.* [(1989)] 210 Cal.App.3d [1554,] 1559 [259 Cal.Rptr. 56].)" (65 Cal.App.4th at p. 1276.)

Because Horn failed to raise a triable issue of fact as to the at-will nature of his employment with C&W, the trial court acted properly in entering summary judgment on his claim for breach of contract. (See 65 Cal.App.4th at p. 1277.)

III.

*Implied Covenant of Good Faith and Fair Dealing*

■ " 'Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.' " (*Foley* v. *Interactive Data Corp.* (1987) 47 Cal.3d 654, 683 [254 Cal.Rptr. 211, 765 P.2d 373], quoting Rest.2d Contracts, § 205.) Where there is no underlying contract there can be no duty of good faith arising from the implied covenant. (See *Foley, supra,* 47 Cal.3d at p. 684 [the nature and extent of the duty imposed by the implied covenant of good faith and fair dealing depends on the

---

[11]This factor was not present in the instant case. However, the Labor Code presumption, supported by the employee handbook, suffices to meet defendant C&W's initial burden to show that Horn was an at-will employee.

specific contractual promises].) Because we have found that summary judgment was properly granted on the ground that Horn's employment was at will, he can state no claim either for breach of an employment contract or for breach of the implied covenant. (Accord, *Gould* v. *Maryland Sound Industries, Inc.* (1995) 31 Cal.App.4th 1137, 1152 [37 Cal.Rptr.2d 718]; *Flait* v. *North American Watch Corp.* (1992) 3 Cal.App.4th 467, 481 [4 Cal.Rptr.2d 522].) The court properly granted summary judgment as to this cause of action.

The judgment is affirmed. The parties shall each bear their own costs on appeal.

Lambden, J., and Ruvolo, J., concurred.

A petition for a rehearing was denied June 7, 1999, and appellant's petition for review by the Supreme Court was denied July 28, 1999.