Filed 2/18/16  Sawhney v. Saint Mary's College of Calif. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| DEEPAK SAWHNEY,<br><br>          Plaintiff and Appellant,<br><br>v.<br><br>SAINT MARY'S COLLEGE OF CALIFORNIA,<br><br>          Defendant and Respondent. | A144311<br><br>(Contra Costa County<br>Super. Ct. No. CIVMSC13-01855) |

Deepak Sawhney asserts claims for discrimination, retaliation, and failure to prevent retaliation against his employer, Saint Mary's College of California (the College).  He now appeals the trial court's order granting the College's motion for summary judgment, rulings on evidence Sawhney submitted in opposition to the motion,[1] and an order awarding costs to the College.  We affirm the grant of summary judgment, but reverse and remand the cost award.

## I.  BACKGROUND

Sawhney is an Asian male.  He was born in the United Kingdom and his ancestors lived in India.  In 2002, Sawhney was hired by the College as an assistant professor in the liberal and civic studies program (the Program), which is part of the school of liberal arts.

---

[1] The pertinent question for much of the evidence to which defendant objected is not whether it is admissible but whether, when considered with the rest of plaintiff's evidence, it is sufficient to raise an inference of animus.  We have reviewed the evidence at issue and, when applicable, we discuss it below.

Marsha Newman, who is White and was the chair of the Program, advocated for a particular White female candidate during the hiring process.

Sawhney was eventually appointed as coordinator of the Program. After about three years at the college, Sawhney sought tenure and promotion. Newman wrote a letter to Dean Stephen Woolpert and the rank and tenure committee expressing her concerns about Sawhney's application. Newman stated Sawhney had demonstrated a lack of willingness to communicate with her about important issues within the Program, and these problems were "not merely a communication difference but an expression of disdain" for Newman and others in the Program. Woolpert continued to support Sawhney's candidacy for tenure, despite these issues. He characterized Sawhney and Newman's relationship as "problematic," but he did not "view it as a problem of such scope that it should trigger concern in the context of a rank and tenure review." Sawhney was ultimately promoted to associate professor and granted tenure in 2005.

In August 2005, Sawhney was relieved of his position as coordinator of the Program. The action was motivated by Newman's recommendation to Woolpert and others at the college. Newman told Sawhney she hoped he would take a leading role in other ways and would agree to head a committee to review the program's curriculum.

A few months later, in November 2005, Woolpert met with Sawhney. According to Sawhney, Woolpert told him his behavior towards Newman was "analogous to that of an alcoholic, and that an alcoholic has a bad gene." Woolpert warned Sawhney he would suffer "severe consequences" if he failed to check his behavior. Woolpert also purportedly reprimanded Sawhney for having Professor Claude-Rhéal Malary, who is Haitian, as a confidante and ordered Sawhney not to speak with him. When Sawhney asserted he was the " 'invisible man' " of the department, Woolpert told him to " 'stop complaining.' " Woolpert also purportedly showed no interest when Sawhney raised concerns about racism and gender bias. In April 2006, Sawhney sent a letter to Woolpert concerning their November 2005 meeting, characterizing Woolpert's handling of the problems in the department as "appalling." Sawhney demanded Woolpert apologize for

2

his conduct at the November 2005 meeting and accused him of "harboring" Newman, who Sawhney referred to as "a racist director."

In or around 2006, the College commissioned an outside investigator to review Sawhney's allegations of discrimination. The investigator found Newman's recommendation to remove Sawhney as coordinator was motivated, in part, by legitimate, nondiscriminatory reasons. However, the investigator also found that, apart from her own experiences with Sawhney, Newman had little objective evidence to support her belief Sawhney has difficulty working with or for women. The investigator concluded: "Making a recommendation based on such motivation appears to violate the College's Non-Discrimination policy." As to Woolpert, the investigator concluded his actions were motivated by legitimate, nondiscriminatory reasons, and there was insufficient evidence to find Woolpert's conduct and interactions with Sawhney violated the nondiscrimination policy. Newman left the college in or around the end of 2005. Woolpert later claimed her departure was due to Sawhney.

In 2009, Woolpert appointed Sawhney as director of the Program. As director, Sawhney supervised the program's coordinator, Monica Fitzgerald, who is White. Sawhney had concerns about Fitzgerald's performance and sought assistance from Woolpert on the matter in September 2011. Sawhney asserts Woolpert failed to direct Fitzgerald to respect him as director, and refused to conduct a performance review of Fitzgerald. Woolpert insisted Sawhney and Fitzgerald work out their differences between themselves. Later in September 2011, Sawhney accused Woolpert of using a double standard based on race and gender because Woolpert had not supported him as director but had supported Newman in that role. In December 2011, Sawhney discussed with human resources the possibility of transferring Fitzgerald to another department. He also requested a human resources representative attend all of his meetings with Fitzgerald.

In 2011, Sawhney sought promotion to full professor. Pursuant to the College's guidelines, the criteria for such a promotion are (1) possession of a doctorate; (2) teaching effectiveness and expertise; (3) service to the College community; (4) "significant scholarly achievement, evidenced at least in part by peer review and

3

public presentation among academic colleagues outside the College"; and (5) contribution and commitment to the aims and ideals of the College. Associate Professor Peter Freund, in consultation with 10 other members of the governing board of the Program, drafted an evaluation of Sawhney's candidacy based on consideration of these factors and submitted it to Woolpert and the chair of the rank and tenure committee. As to scholarship, the evaluation stated: "[Sawhney's] publication record is impressive, and his intellectual credentials impeccable." The governing board also found Sawhney satisfied the other four criteria discussed above and recommended him for promotion.

Woolpert disagreed with the governing board's recommendation. As to teaching effectiveness, Woolpert was concerned there were no recent classroom observations in Sawhney's file. Woolpert also expressed concerns regarding Sawhney's scholarly pursuits, noting Sawhney's curriculum vitae did not list any publications since 2004. While Sawhney had given six presentations between 2006 and 2010, it was unclear whether these presentations represented new scholarly writing or lectures about existing research. Woolpert also observed Sawhney's book project was only in its early stages. Woolpert took issue with Sawhney's service because of the relatively limited scope of his participation in campus-wide activities. Finally, Woolpert believed Sawhney had not demonstrated an ability to work well with others, noting his personal conflicts with both Newman and Fitzgerald. The rank and tenure committee also recommended against Sawhney's promotion. Like Woolpert, the committee was concerned about Sawhney's lack of recent peer teaching reviews, his lack of recent scholarship, his service to the wider campus, and his ability to work productively with others.

In the meantime, on May 1, 2012, Sawhney emailed the provost, asserting Woolpert had "perpetually created double standards based on protected classes of race, gender and religion." Sawhney complained human resources had taken no action when he requested Woolpert be recused from the promotion review. Sawhney also once again took issue with Woolpert's handling of his conflicts with Newman and Fitzgerald, and accused Woolpert of defaming his character. The provost ultimately agreed with

4

Woolpert and the rank and tenure committee and recommended against Sawhney's promotion.

On May 30, 2012, Brother Ronald Gallagher, president of the College, denied Sawhney's promotion. Gallagher testified the recommendations of both Woolpert and the rank and tenure committee played a "significant" role in his decision.

In or around April 2012, several individuals began to talk with Woolpert about the possibility of reassigning either Sawhney or Fitzgerald out of the Program to resolve the relationship problems between the two. Linda Saulsby, a Program faculty member, told Woolpert that Fitzgerald and Sawhney would never be collegial colleagues, the program's faculty was " 'essentially at war with one another,' " and Sawhney might be " 'misplaced' in the Program." On or around July 17, 2013, Sawhney was informed he would be reassigned to the College's philosophy department. A few days later, the chair of the philosophy department grieved the reassignment, contesting the administration's authority to make it. The College's president, James Donahue, who succeeded Gallagher, ultimately affirmed Woolpert's authority to reassign Sawhney. Woolpert intended the reassignment to be effective at the beginning of the fall 2013 semester. However, his plans were delayed by the grievance so he authorized Sawhney to spend 15 weeks of paid time to focus on his research and develop new course content.

Sawhney filed a complaint with the Department of Fair Employment and Housing (DFEH) on May 28, 2013, and served the complaint on the College on July 8, 2013. On August 22, 2013, Sawhney filed this action in superior court. He asserted claims for discrimination, retaliation, and failure to prevent discrimination based on race, national origin, and gender. He also asserted a claim under the federal Civil Rights Act of 1964 for wrongful denial of promotion. Defendant's demurrer to this last claim was sustained without leave to amend. Defendant later moved for summary judgment as to the remaining claims. The trial court granted the College's motion, and entered judgment dismissing Sawhney's case and awarding the College costs.

## II.  DISCUSSION

### A.  *Standard of Review*

The standard of review for a summary judgment motion in favor of a defendant is well settled.  We "independently assess the correctness of the trial court's ruling by applying the same legal standard as the trial court in determining whether any triable issues of material fact exist, and whether the defendant is entitled to judgment as a matter of law."  (*Rubin v. United Air Lines, Inc.* (2002) 96 Cal.App.4th 364, 372, fn. omitted.)  "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the [plaintiff] in accordance with the applicable standard of proof."  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, fn. omitted.)  The trial court must view that evidence, and any reasonable inferences from that evidence, "in the light most favorable to" the plaintiff.  (*Id.* at p. 843.)  We review the trial court's ruling de novo.  (*Id.* at p. 860.)  The trial court's evidentiary rulings are reviewed for abuse of discretion.  (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317.)

### B.  *Discrimination*

Sawhney asserts the College engaged in discrimination when it denied his promotion and transferred him to the philosophy department.  Sawhney specifically targets Woolpert.  According to Sawhney, Woolpert's actions were motivated by bias against Asians, Indians, and males, and Woolpert's bias infected the entire review process.  We find Sawhney failed to raise a triable issue of fact, and thus the trial court properly granted the College's motion for summary judgment as to Sawhney's discrimination claim.

#### 1.  Applicable Law

"Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes."  (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*).)  "In California, courts employ at trial the three-stage test that was established in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802, to resolve discrimination claims . . . ."

(*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 520, fn. 2 (*Reid*).) At trial, the employee must first establish a prima facie case of discrimination by providing evidence "(1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Guz*, at p. 355.) "Once the employee satisfies this burden, there is a presumption of discrimination, and the burden then shifts to the employer to show that its action was motivated by legitimate, nondiscriminatory reasons. [Citation.] A reason is ' "legitimate" ' if it is 'facially unrelated to prohibited bias, and which if true, would thus preclude a finding of discrimination.' [Citation.] If the employer meets this burden, the employee then must show that the employer's reasons are pretexts for discrimination, or produce other evidence of intentional discrimination." (*Reid*, at p. 520, fn. 2, italics omitted.)

In the context of a motion for summary judgment brought by the employer, "Assuming the complaint alleges facts establishing a prima facie case that unlawful disparate treatment occurred, the initial burden rests on the employer (moving party) to produce substantial evidence (1) negating an essential element of plaintiff's case or (2) (more commonly) showing one or more legitimate, nondiscriminatory reasons for its action against the plaintiff employee . . . . [¶] . . . The burden then shifts to the plaintiff employee (opposing party) to rebut defendant's showing by producing substantial evidence that raises a rational inference that discrimination occurred; i.e., that the employer's stated neutral legitimate reasons for its actions are each a 'pretext' or cover-up for unlawful discrimination, or other action contrary to law or contractual obligation." (Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2015) ¶¶ 19:728 to 19:729, p. 19-117, italics omitted.) By applying *McDonnell Douglas*'s[2] shifting burdens of production in the context of a motion for summary judgment, " 'the

---

[2] (*McDonnell Douglas Corp. v. Green, supra*, 411 U.S. 792 (*McDonnell Douglas*).)

7

judge [will] determine whether the litigants have created an issue of fact to be decided by the jury.' " (*Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 805–807 (*Horn* ).)

"[T]o avoid summary judgment, an employee claiming discrimination must offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination." (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1004–1005.) "[T]he employee [cannot] simply show the employer's decision was wrong, mistaken, or unwise. Rather, the employee ' "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' [citation], and hence infer 'that the employer did not act for the [. . . asserted] non-discriminatory reasons.' " ' " (*Horn*, *supra*, 72 Cal.App.4th at p. 807, italics omitted.)

## 2. Failure to Promote

### a. *Defendant satisfied its initial burden*

We now turn to Sawhney's contention that the College engaged in unlawful discrimination by refusing to promote him to full professor in 2012. Defendant satisfied its initial burden on this claim by producing evidence there were legitimate, nondiscriminatory reasons for denying promotion. Specifically, there was evidence Sawhney was unqualified for promotion because he had not published any scholarly work since 2004. While Sawhney had made presentations at various conferences between 2005 and 2011, he failed to provide the manuscripts and papers he presented at these conferences with his application materials. As stated by the rank and tenure committee: "In the absence of manuscripts for these essays and of evidence of the kind and level of peer-review these received . . . , the Committee was not able to adequately assess the degree to which these presentations constitute evidence of significant scholarly achievement . . . ." There was also evidence Sawhney was not qualified for promotion

8

because he did not work well with others, as documented by complaints lodged by at least two women in Sawhney's program.

Sawhney argues Woolpert recommended the promotion of two Caucasian males to full professor despite the absence of peer-reviewed or published scholarship. But the evidence to which Sawhney cites does not support this claim. To the contrary, the record shows one of the candidates published two peer-reviewed journal articles, published an invited article, edited an article, and had two works in progress in the six years before his promotion to full professor in 2010.[3] The other candidate published one book, three essays, and presented at three conferences in the seven years between tenure and promotion. It is undisputed Woolpert has only recommended faculty for promotion to full professor where their records reflected peer-reviewed scholarly achievements. It is also undisputed that from 2008 through 2013, eight of the 10 candidates promoted to full professor had work published in a book, anthology, or peer-reviewed journal within five years of their promotion.[4]

### b. *Sawhney failed to raise an inference of discrimination*

For the reasons set forth above, the burden shifted to Sawhney to produce substantial evidence that raises a rational inference of discrimination. Sawhney asserts he met that burden by showing Woolpert was biased against him. Sawhney contends Woolpert consistently sided with White women, specifically Newman and Fitzgerald, and against him because of his race, national origin, and gender. Sawhney points to the fact Woolpert raised Newman's collegiality concerns when recommending Sawhney for tenure. Sawhney also claims Woolpert likened him to an alcoholic and accused him of having collegiality problems when, in 2005, Sawhney asserted Newman was biased.

---

[3] Sawhney argues we should consider only work published in the four years between the time this candidate earned tenure and was promoted to full professor. But the issue is whether this candidate is similarly situated to Sawhney, and Sawhney did not apply for promotion to full professor until six years after he earned tenure. Moreover, unlike Sawhney, this candidate published scholarly work between tenure and promotion, or at least was close to completing such work.

[4] The two exceptions were members of the performing arts department.

9

According to Sawhney, Woolpert expressed bias again in 2011, when he tried to resolve the interpersonal conflict between Sawhney and Fitzgerald.

We are not convinced. There have been several instances when Woolpert actually supported Sawhney during the relevant period. (Cf. *Horn, supra,* 72 Cal.App.4th 798, 809 [where the same actor is responsible for both hiring the plaintiff and the adverse employment action, and both actions occur within a short period of time, " 'a strong inference arises that there was no discriminatory motive' "].) Despite Newman's complaints about Sawhney in 2005, Woolpert recommended him for tenure and promotion. Four years later, in 2009, Woolpert appointed Sawhney as director of the Program.[5] Moreover, Woolpert's handling of Sawhney's contentious relationships with Newman and Fitzgerald does not establish a pattern or practice of hostility. Sawhney's relationships with these women were clearly problematic, and Woolpert, as dean, had a responsibility to address the situation. That in the course of mediating these disputes Woolpert sometimes sided with Newman and Fitzgerald and may have accused Sawhney of gender bias is insufficient, without more, to raise the inference Woolpert was biased against Sawhney because of his race, gender, or national origin. Indeed, in light of the serious allegations leveled by two different women in the program, Woolpert had a legitimate reason to express doubts about Sawhney's interpersonal skills.

Sawhney argues a December 2005 letter from Malary to Woolpert raises a reasonable inference Woolpert allowed racial and gender bias to cloud his supervision.[6] In the letter, Malary stated he suspected Newman was prejudiced against Sawhney and that her "bigotry" may be "racial, ethnic, religious, or gender [in] nature." Malary enunciated three reasons for his belief. First, Sawhney was hired "in spite of [Newman]," as Newman preferred a White female candidate over him. Second, shortly after Sawhney

---

[5] Sawhney argues the decision to make him director was the product of limited choices more than good will. He points out the program consists of only two ranked and one or two adjunct faculty, and one of them needed to serve as director. Nevertheless, Sawhney does not dispute there were other candidates for the director position.

[6] It appears the trial court considered this letter, as its ruling on the College's objection merely states: "Redacted. Under seal."

was hired, Malary told Newman about a conversation he had with Sawhney concerning Sawhney's moving arrangements. Newman responded: "Oh, why didn't he call me? These Indian men. You think he might have trouble with me being a woman?" Third, Newman later lied, claiming this conversation never took place and she was told by other faculty members to write a letter against Sawhney. Newman also denied she was a racist because she had formerly been married to an Indian man. Malary speculated Newman's bad experience with her ex-husband, who had the same first name as Sawhney, may have influenced her view of Sawhney. Malary's letter does not change our analysis. While Malary's description of his interactions with Newman is admissible, his conclusion that Newman's actions were motivated by race, ethnicity, gender, or religion is inadmissible speculation. Additionally, Woolpert's intent, not Newman's, is at issue here. Woolpert's decision not to believe Malary's allegations does not raise the inference Woolpert was biased against Sawhney.

Nor does Woolpert's November 2005 discussion with Sawhney, during which Woolpert purportedly likened Sawhney to an alcoholic, raise a triable issue. Sawhney is not asserting a claim for harassment. Even if he was, this incident falls well outside the statute of limitations. At most, this discussion is relevant to prove Woolpert's intent in recommending against Sawhney's promotion seven years later. But the long period of time between the 2005 comments and the promotion decision undercuts the inference Woolpert was biased against Sawhney because of his race, national origin, or gender. Moreover, we can only speculate as to whether the comments Woolpert purportedly made in 2005 were motivated by a bias against males, Asians, or Indians. There is no indication Woolpert referenced Sawhney's race during this discussion, or that any of his comments were racially charged. Significantly, Woolpert's comments were made only a few months after he had recommended Sawhney for tenure.

Sawhney also makes much of a comment by Woolpert to Saulsby concerning Sawhney's "culture." When asked whether she had any basis to suggest Woolpert's evaluation of Sawhney had anything to do with his race, ethnic origin, or gender, Saulsby responded: "[Woolpert] mentioned his culture." Asked to clarify, Saulsby testified:

11

"That sometimes it could be difficult to communicate with [Sawhney] because of his culture. [Woolpert] did say that a couple of times." This comment is ambiguous at best. It is entirely unclear from the limited context whether Woolpert was asserting Sawhney was difficult to work with because of his Indian or Asian background. We recognize that on a defendant's motion for summary judgment we must look at the evidence in the light most favorable to the plaintiff. But we cannot find Sawhney has raised a triable issue of bias based on a single ambiguous comment concerning Sawhney's communication style.

Contrary to Sawhney's contention, this case is distinguishable from *Clark v. Claremont University Center* (1992) 6 Cal.App.4th 639 (*Clark*). As in the instant action, the plaintiff in *Clark* brought a claim for discrimination against a university after he was denied promotion and tenure. (*Id.* at p. 643.) On appeal, the court found the jury's verdict in favor of the plaintiff was supported by sufficient evidence. (*Ibid.*) Among other things, the court held the plaintiff was not required to prove intentional discrimination at each stage of the review process, because those stages were not compartmentalized. (*Id.* at pp. 668–669.) But the evidence of discriminatory intent was much stronger in *Clark* than it is here. One of the members of the review committee used a racial epithet to describe the plaintiff, and during a meeting about plaintiff's tenure application, he remarked: " 'Who in the hell does he think he is anyway.' " (*Id.* at pp. 648, 652.) During that same meeting, another professor stated, " 'I don't know how I would feel working on a permanent base [*sic*] with a black man,' " to which another professor responded, " '[W]e are not under any obligation to have any blacks.' " (*Id.* at p. 652.) In contrast, in the instant action, there is no evidence Woolpert or any other person who reviewed Sawhney's application for promotion made any derogatory comments regarding Sawhney's race, national origin, or gender. Instead, Sawhney argues we should infer Woolpert's mediation of various interpersonal conflicts was motivated by a discriminatory intent, and from that we should also infer Woolpert harbored animus towards Sawhney. These inferences are too tenuous to raise a triable issue.

12

### c. *Sawhney's "me too" evidence*

Sawhney argues evidence concerning the experience of other faculty and students of color is relevant to show the College and Woolpert harbored a discriminatory intent. The trial court sustained the College's objections to much of this "me too" evidence on relevancy grounds. Sawhney asserts these evidentiary rulings were erroneous, and suggests they constitute an independent basis for reversing the trial court's grant of summary judgment. We find that regardless of whether this "me too" evidence was admissible, it is insufficient to raise an inference of discriminatory intent.

Several courts have found "me too" evidence to be relevant and admissible in discrimination and harassment cases. (See *Johnson v. United Cerebral Palsy/Spastic Children's Foundation* (2009) 173 Cal.App.4th 740, 747 (*Johnson*) and *Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 115 (*Pantoja*).) In *Johnson*, the plaintiff alleged she was terminated because she was pregnant. (*Id.* at p. 744.) In opposition to the defendant's motion for summary judgment, the plaintiff submitted declarations from three employees who stated they worked at the same facility, had the same supervisors, and were fired after it was revealed they were pregnant. (*Id.* at p. 761.) The court held the declarations were admissible because they presented factual scenarios similar to the one presented by the plaintiff, and the probative value of the declarations clearly outweighed any prejudice that would be suffered by the defendant. (*Id.* at p. 767.)

Likewise, in *Pantoja*, the court held the jury should have been allowed to hear "me too" evidence concerning harassing activity against female employees other than the plaintiff. (*Pantoja*, *supra*, 198 Cal.App.4th at p. 92.) The plaintiff had alleged her employer touched her buttocks, referred to his employees as " 'my Mexicans,' " called the plaintiff a " 'stupid bitch,' " and fired her. (*Id.* at p. 93.) At trial she sought to introduce evidence the defendant verbally abused and inappropriately touched other female employees. (*Id.* at p. 97.) The court found this evidence was relevant to prove the defendant's intent, to impeach the defendant's credibility, and to rebut factual claims made by defense witnesses. (*Id.* at pp. 109–110.)

13

Here, Sawhney claims two other minority faculty members in the Program, Saulsby and Mindy Ware, also experienced discrimination. Saulsby asserted she was subjected to verbal and threatening intimidation and was referred to as " 'You people' " by others at the College. Saulsby reported the intimidation to Woolpert, but she does not believe he investigated further. Saulsby also claimed "[t]here was a lot of undermining . . . of faculty in the program" and when she brought this to Woolpert's attention "he would listen, but he never was . . . aggressively supportive." Ware asserts she and another lecturer in the Program were excluded and no longer invited to faculty meetings after Fitzgerald was appointed as director of the program. Ware, like Sawhney, also had a difficult working relationship with Fitzgerald.

Without more, this "me too" evidence is insufficient to raise an inference that Woolpert was biased against Sawhney because of his race, national origin, or gender. As an initial matter, Saulsby and Ware are not similarly situated to Sawhney. Saulsby is an African-American woman, and Ware is a "woman of color," while Sawhney is a man of Indian and Asian descent. And neither Saulsby nor Ware claim Woolpert recommended against their promotion. Moreover, unlike in *Johnson* and *Pantoja*, Saulsby and Ware do not assert Woolpert harassed them. Saulsby merely claims Woolpert did not make a sufficient effort to support her. Ware's testimony primarily concerns Fitzgerald, whose intent is not at issue in this case. In any event, Fitzgerald's treatment of lecturers has no bearing on Sawhney's claims for discrimination based on race, national origin, and gender. Ware's only specific complaint against Woolpert appears to be that he did not include her on an email announcing Sawhney's reassignment to the philosophy department. Accordingly, we cannot infer Woolpert's conduct toward Saulsby and Ware raises an inference Woolpert blocked Sawhney's promotion because Sawhney is a man, because he is Asian, or because he is Indian.

The other "me too" evidence offered by Sawhney—evidence concerning the experiences of E.J. Youngblood, Tom Brown, and Nushafarin Safinya—has even less probative value. Youngblood, an African-American student, asserts he was subjected to racist remarks and behavior by a professor in the College's music department, and

14

Woolpert failed to adequately respond to the incident. Youngblood does not assert he was discriminated against or harassed by Woolpert, and in any event, as an African-American student he is not similarly situated to Sawhney. Sawhney also sought to introduce an undated and unsigned letter from Brown to Woolpert, in which Brown complains about Woolpert's decision to remove him from an advisory board. Other than a vague reference to Brown's involvement in the controversy concerning Youngblood, the letter does not contain any allegations of discrimination. Safinya, another person of color, asserts Woolpert eliminated long-standing programs for nonnative learners at the behest of the English department and composition program. By Safinya's own admission, the disputes between these programs stretched back decades. In any event, the facts set forth in Safinya's declaration shed no light on Woolpert's decision to recommend against the promotion of an English-speaking faculty member in a completely different department.

Sawhney also sought to introduce evidence from Malary and the Western Association of Schools and Colleges (WASC) concerning general attitudes towards diversity at the College. This too is insufficient to raise an inference Sawhney was denied promotion because of his race, national origin, or gender. Malary testified he "cannot recommend Saint Mary's to any person of color" and recounted his experience on the College's "Inclusive Excellence" committee. A 2007 report by the WASC states there were ongoing and long-term concerns regarding issues of diversity at the College. The WASC also found "tolerated 'acts' of incivility seemed to be directed toward 'faculty of color' and/or female faculty, thereby giving the appearance of racism and discrimination." In 2009, the WASC issued another report stating the College had "supported a series of positive efforts to increase awareness, knowledge and skills for improving cultural competency." Nevertheless, the WASC found instances of incivility had not disappeared, concluding the College is best described as a " 'project in the works.' " None of this evidence directly relates to Woolpert—the only person to whom Sawhney ascribes bias—and thus is irrelevant to prove intent. Sawhney cannot use general evidence of incivility around the college to bootstrap a claim for discrimination.

15

### 3. Reassignment

To the extent Sawhney's discrimination claim is also predicated on his reassignment to the philosophy department, the claim also fails. Defendant met its initial burden by showing there was a legitimate, nondiscriminatory reason for the reassignment. There is evidence the strife between Sawhney and Fitzgerald was negatively affecting the Program and one of them had to go. There is also evidence that reassigning Fitzgerald was not feasible given her background and the placement options.[7] Sawhney asserts the philosophy department was a bad fit for him because he followed a different school of thought than others in that department. But it is undisputed that Sawhney has a Ph.D., masters, and bachelors in philosophy, and he has taught in other philosophy departments in the past. We also find, for the reasons set forth above, that Sawhney failed to introduce sufficient evidence to raise the inference Woolpert was biased against Sawhney because of his race, national origin, or gender, or that such bias motivated Woolpert's decision to reassign Sawhney. (See section II.B.2.b. & c., *ante*.)[8]

### C. *Retaliation*

We next consider and reject Sawhney's contention that the trial court erred in granting summary judgment in favor of the College on the retaliation claim.

To establish a prima facie case for retaliation, an employee must show "(1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity

---

[7] Woolpert considered placing Fitzgerald in the history department and women's and gender studies program. However, the history department already had two tenured faculty specialists in American history, which would have been Fitzgerald's area of focus, and the women's gender studies program was too small to accommodate another ranked faculty member.

[8] The College argues Sawhney's claim fails for the additional reason that his reassignment to the philosophy department did not constitute an adverse employment action because it did not have a substantial and detrimental effect on his employment. But the chair of the philosophy department testified Sawhney's transfer could affect his prospects for promotion. Woolpert disagreed with this assessment, but that is insufficient to show there are no triable issues of fact as to Sawhney's status in the philosophy department.

and the employer's action." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.) Like claims for discrimination, retaliation claims are subject to the *McDonnell Douglas* burden-shifting analysis (*Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1108–1109), which is discussed above. (See section II.B.1., *ante*.) In the context of an employer's motion for summary judgment, the employer must produce substantial evidence negating an essential element of the plaintiff's case or showing a legitimate, nondiscriminatory reason for its conduct. (See Chin et al., Cal. Practice Guide: Employment Litigation, *supra*, ¶¶ 19:728 to 19:729, p. 19-117.) The burden then shifts to the plaintiff to rebut the defendant's showing by producing substantial evidence raising a rational inference that retaliation occurred. (See *ibid.*)

In this case, Sawhney argues Woolpert indicated he was ready and willing to retaliate against him in 2005, when Woolpert told Sawhney to "stop complaining" about Newman's alleged gender and racial discrimination. Sawhney contends he started reporting discrimination again in 2011. At that time, Sawhney accused Woolpert of treating Fitzgerald more favorably than he had treated Sawhney when he was coordinator of the Program in 2005, because "[Fitzgerald] is a white female and not a colored, non-Catholic male." Sawhney asserted similar complaints against Woolpert in his May 2012 email to the provost. Sawhney asserts Woolpert retaliated against him for complaining about this alleged discrimination by recommending against his promotion in 2012 and reassigning him to the philosophy department. Sawhney also asserts the July 17, 2013 reassignment was retaliation for the DFEH complaint Sawhney served on the College only a few days earlier.

We find there is no causal nexus between the protected activity and the denial of Sawhney's promotion or his reassignment to the philosophy department. Sawhney's contention that the College retaliated against his complaints of discrimination in 2005 by executing various adverse employment actions in 2012 and 2013 strains credulity. To the extent there could ever be a causal nexus where there is a seven- or eight-year gap between the protected activity and the adverse employment action, the facts here still

17

cannot support a finding of causality. While Woolpert was supposedly lying in wait, he took the opportunity to promote Sawhney to director of the Program.

We also fail to see the causal nexus between Sawhney's complaints of discrimination in 2011 and 2012, and the promotion decision and reassignment. "[T]emporal proximity alone is not sufficient to raise a triable issue as to pretext once the employer has offered evidence of a legitimate, nondiscriminatory reason for the [adverse employment action]. [Citations.] This is especially so where the employer raised questions about the employee's performance before he disclosed his symptoms, and the subsequent termination was based on those performance issues." (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 353, italics omitted.) Here, the College provided legitimate reasons for its decision to deny Sawhney's promotion and transfer him to the philosophy department, including Sawhney's failure to publish any recent scholarly work and his collegiality problems with others in the Program. Moreover, the concerns about Sawhney's collegiality predated his 2011 complaints of discrimination. Woolpert first raised the issue with Sawhney as early as 2005. While Sawhney may not have been previously warned about his lack of scholarship, publication was an established criteria and it should have come as no surprise this would be considered during a promotion review.

Nor has Sawhney raised an inference that Woolpert's decision to reassign him was motivated by the DFEH complaint. As Sawhney points out, he was notified of the reassignment on July 17, 2013, only nine days after the DFEH complaint was served on the College. However, the reassignment was in the works long before Sawhney served his DFEH complaint. It is undisputed Woolpert first seriously considered reassigning either Sawhney or Fitzgerald out of the Program in April 2012, over a year before the reassignment decision was made. "Employers need not suspend previously planned transfers upon discovering that a [discrimination] suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." (*Clark County School Dist. v. Breeden* (2001) 532 U.S. 268, 272; see *Arteaga v. Brink's, Inc.*, *supra*, 163 Cal.App.4th at p. 354 [" 'Precedent

18

does not prevent [an employer] from removing such an employee simply because the employee [recently] engaged in a protected work activity' "].) And while Sawhney asserts Woolpert decided to reassign him on the same day Sawhney was notified of the decision, it is unclear how Sawhney came to have personal knowledge of this fact. It appears to be speculation.

## D. *Failure to Prevent Discrimination and Retaliation*

An employer must "take all reasonable steps necessary" to prevent discrimination from occurring. (Gov. Code, § 12940, subd. (k).) A plaintiff may not recover for failure to prevent discrimination and retaliation where no discrimination or retaliation has actually occurred. (See *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 288–289.) Because Sawhney has failed to raise a triable issue as to his claims for discrimination and retaliation, his claims for failure to prevent also fail.

## E. *Costs*

After prevailing on its motion for summary judgment, the College filed a memorandum of costs. The parties stipulated to reduce the amount sought in the memorandum. On February 6, 2015, the trial court approved the stipulation, and awarded costs in the amount of $23,433.88. Several months later, our Supreme Court issued its opinion in *Williams v. Chino Valley Independent Fire Dist.* (2015) 61 Cal.4th 97 (*Williams*), holding that a prevailing defendant in a discrimination action "should not be awarded fees and costs unless the court finds the action was objectively without foundation when brought, or the plaintiff continued to litigate after it clearly became so." (*Id.* at p. 115.) As this issue was not raised below, the trial court did not have the opportunity to make any such findings. Sawhney argues we should remand so the trial court may determine whether the award of costs is appropriate under *Williams*. The College appears to agree. In the alternative, Sawhney asserts the award of costs may be reversed without any need to remand the matter. We agree with the College this is a question that should be addressed by the trial court in the first instance, especially since the record may be further developed on this issue. Accordingly, the trial court's award of costs is reversed and remanded.

19

## III.  DISPOSITION

We reverse and remand the award of costs so the trial court may determine whether they are appropriate under *Williams*, *supra*, 61 Cal.4th 97.  The judgment is affirmed in all other respects.  The parties shall bear their own costs on appeal.

_____
Margulies, J.

We concur:


_____
Humes, P.J.


_____
Banke, J.


A144311