Filed 12/22/23  St. Hubert v. Fox Corporation CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| FRITZGERARD ST. HUBERT, | B322737 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 20STCV38145) |
| v. | |
| FOX CORPORATION, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jon R. Takasugi, Judge.  Affirmed.

Valencia & Cywinska, Mark Joseph Valencia and Izabela Cywinska Valencia for Plaintiff and Appellant.

Seyfarth Shaw, Candace Bertoldi and Robin E. Devaux for Defendant and Respondent.

_____

A temporary service agency assigned appellant Fritzgerard "Joey" St. Hubert to work at respondent Fox Corporation in information technology (IT).  After 10 weeks, Fox told the agency that it no longer wanted his services.  The next day, St. Hubert notified Fox that he has epilepsy.  Fox ended his services two days later.  He sued Fox for failing to accommodate a disability, retaliation, and wrongful termination under the California Fair Employment and Housing Act (FEHA).  (Gov. Code, § 12900 et seq.)[1]  The trial court granted summary judgment to Fox.

On de novo review, we conclude that no triable issues of fact exist. There was nothing to accommodate because St. Hubert admitted that epilepsy did not interfere with his work at Fox. His disclosure of epilepsy *after* Fox decided to end his services belies a claim of retaliation.  Coworkers testified that he was let go because he did not get along with others and his performance was unsatisfactory.  We affirm the judgment.

## FACTS

### St. Hubert's Agreement With TenTek

St. Hubert signed an Agreement For Temporary Employee Services with TenTek Corporation, an IT staffing agency.  He was "a temporary, hourly paid, exempt employee of TenTek," which "arrange[d] to introduce [him] to clients who may require temporary consulting services."  TenTek assigned him to Fox as an "end user support technician."  Fox needed IT staff while adapting to remote work during the COVID pandemic.  TenTek billed Fox for its contractors' time.

Fox could end St. Hubert's assignment at any time, without notice.  It had the option to hire him at the end of the six-month

---

[1] Undesignated statutory references are to the Government Code, unless otherwise indicated.

2

consulting term. St. Hubert agreed, in writing and at deposition, that he was "not an employee of Fox, but rather being retained as an independent contractor." He later testified that he believed he was a Fox employee.

## St. Hubert Begins at Fox

On June 8, 2020, St. Hubert began his assignment at Fox.[2] On July 7, he was admonished by Fox supervisor Stuart Bourke and Vice-president of Technology Carl Johnson, for failing to return a computer to a Fox employee. They were concerned by his lack of attention to detail.

On July 20, Bourke e-mailed the IT team to commend their "progress on the IT room [ ] and all your efforts to support our end users. There have been a few minor issues with workload distribution and priority and this is where I see a need for a lead to ensure we continue with the great work done so far. I am asking [St. Hubert] to assume team lead responsibilities as we transverse [*sic*] this ever-changing work environment during these times, this will be reviewed on a monthly basis as we seek to optimize our team's service delivery." Bourke would look to St. Hubert "to ensure we are adhering to deadlines and prioritizing workload."

Bourke named St. Hubert as lead person because he was the most experienced person on a new team and claimed expertise in asset management. He was expected to take requests from Fox employees and distribute them to the team evenly. There was no pay increase because he was not a Fox employee. St. Hubert viewed it as a promotion. Bourke referred to it as a promotion in a message to Johnson, saying "the team

---

[2] All dates referenced in this opinion are to the year 2020, unless otherwise indicated.

needs direction."  Johnson wrote to compliment the entire team on their work.

### Fox Receives Complaints About St. Hubert

On July 16, End User Support Manager Jared Zabel wrote Bourke about a " 'negative workplace interaction' " with St. Hubert, who was " 'rude and condescending' " and made Zabel " 'extremely uncomfortable.' "  Bourke thought they were just "bumping heads" but later saw a pattern of negative interactions between St. Hubert and members of the IT team.

Bourke wrote that IT staff " 'all hate Joey' "—he made their job difficult by insisting they sit in meetings instead of completing tasks.  Bourke met with team members John Avila, Jose Gonzalez, Javier Hernandez, and William Nunez.  They described the difficulty of working with St. Hubert.

Team member Avila avers that St. Hubert was "brash, manipulative, and controlling, for no apparent reason.  He did not listen to me and spoke in a condescending way."  He made things so difficult that team members complained to Bourke.  Avila told Bourke that St. Hubert made him "uncomfortable and was treating me in a demeaning way."  St. Hubert responds that as Avila's supervisor, he was entitled to control him; he denies being brash or manipulative.

Gonzalez avers that St. Hubert wasted time by requiring long daily meetings to discuss unnecessary issues, spoke "in a mocking, overly exaggerated tone," and made Gonzalez look bad by preventing him from expediting delivery of computers to Fox employees.  St. Hubert micromanaged team members but did not seem to do any work himself or respond to messages.  Gonzalez and others complained to Bourke that St. Hubert made their jobs

difficult and created a hostile environment.  St. Hubert declares that daily meetings were Bourke's idea.

Hernandez declares that St. Hubert did not do day-to-day work or answer questions.  It was difficult to work with St. Hubert, who did not listen and rejected ideas even though Hernandez had two years of experience at Fox.  St. Hubert led meetings but otherwise sat around.  He did not establish a procurement system, respond to requests for equipment, and ignored Bourke's directions.  Hernandez expressed concerns about St. Hubert to Bourke.

### Fox Decides It No Longer Wants St. Hubert's Services

In August, Bourke decided to end St. Hubert's work at Fox over concerns about his performance and communication style. He did not complete tasks, follow instructions, or pay attention to detail.  Team members complained about him.  His resume claimed asset management experience, but Bourke saw no evidence of it.  For Bourke, "The main issue [was] his inability to perform the duty that he was sent to us by TenTek to complete."

Bourke wanted Javier Hernandez to take over.  On August 11, while on vacation, Bourke e-mailed St. Hubert asking him to train Hernandez on asset management and workflows. On August 12, Fox Vice-president Johnson met with St. Hubert, who "did not have good or correct answers for a lot of my questions."  Johnson sent St. Hubert a list of actions to complete; Bourke was upset because he had already covered the very same action items with St. Hubert.  On August 13, Johnson was displeased when St. Hubert failed to execute a simple task for a Fox executive without error.  Johnson wrote Bourke, "You can move on from Joey . . . ."

On August 14, St. Hubert prepared a spreadsheet after Bourke told him not to do so. Bourke wrote Johnson that he wanted Hernandez to take over from St. Hubert. Johnson wrote, " 'Get rid of him, then.' " Bourke replied, " 'Hence the need for him to hand over his tasks.' " Bourke testified that he meant, "I'm getting rid of him" and "I'm ending his contract." Johnson testified that they did not terminate St. Hubert that day because Bourke was on vacation and IT services would be impacted.

On August 18, Bourke wrote TenTek Vice-president Joe Elizondo that they needed "to have a chat about Joey." They discussed St. Hubert's contract with Fox. Elizondo recalled that Bourke felt St. Hubert did not fit on the team and described communication issues. Because St. Hubert was in the process of handing over his responsibilities and a replacement IT person was needed, Fox and TenTek tentatively agreed that he would leave by the end of August.

On August 17–18, St. Hubert tried to see Bourke in person. Bourke was busy or working remotely. St. Hubert wrote Bourke that progress was being made "but something seems off." Bourke replied that he was catching up after vacation.

### St. Hubert Discloses His Medical Condition

On August 19, St. Hubert wrote Bourke and Johnson, "This topic is much better suited for an in person conversation, but I must share with you as soon as possible. I have been recently diagnosed with epilepsy. Now, with insurance, I am working with a doctor to prevent additional seizures. I've discussed this in depth with the team and will continue to develop contingency plans to mitigate a crisis and/or handle in the most appropriate manner."

6

St. Hubert believes his message sought accommodations. He declares that Fox could have provided a worksite redesign, padding, rest breaks, schedule adjustments, written instructions to address memory lapses, a crisis plan, task rotation, and lighting changes. He did not ask for anything but expected Fox to initiate discussions with him, once he disclosed his condition. He does not explain how these items were necessary to enable him to perform the essential functions of his job.

Bourke did not respond because he had already decided to end St. Hubert's stint at Fox. He viewed the message as "an informational email. There was [*sic*] no requests made." Johnson had a similar view.

Bourke wrote Johnson to ask if the epilepsy e-mail changed anything. Johnson replied, "Not as far as I am concerned, unless there is a drastic improvement in performance. It may explain his change in behavior, as even Joe said he's a totally different person." Bourke did not believe that epilepsy affected St. Hubert's performance at work. Johnson felt the epilepsy disclosure did not matter because Fox had already decided to end St. Hubert's contract.

## St. Hubert Testifies that Epilepsy Did Not Interfere with His Work at Fox

In January 2019, St. Hubert had a seizure; he was taken to the hospital but testified that he "shrugged it off." In January 2020, he had another episode and was diagnosed with epilepsy. He takes medication to mitigate the risk of seizures and makes sure to get enough sleep and avoid flashing lights.

At deposition, St. Hubert was asked, "Other than when you have a seizure, you don't feel that your epilepsy interferes with your daily activities?" He replied, "Thankfully, no. I'm able to operate like a fully functioning adult." The next question was,

7

"Did your epilepsy interfere with your ability to do your job between June 2020 and August 21, 2020, [while] you were placed at Fox?" He replied, "No. No."

While at Fox, St. Hubert took a sick day, testifying that he had food poisoning. At the time, he told Elizondo "he ate something" that upset his stomach. Bourke told him not to come in if he was unwell. In a declaration, St. Hubert claims he had food poisoning and a seizure on August 10; however, he testified that he did not tell this to Bourke. His girlfriend declares that she heard he had a seizure but did not witness it. She alerted Bourke that St. Hubert was unwell but did *not* disclose that he has epilepsy.

It is undisputed that St. Hubert never had a seizure while working on site at Fox. He did not tell TenTek or Fox's human resources department about his epilepsy; Bourke and Johnson were unaware of it until they received the August 19 e-mail. St. Hubert told other TenTek contractors on his team of his condition on August 17. They did not tell Fox because it was not their place and he did not ask them to do anything.

To dispute Fox's claim that he had no work limitations from epilepsy while at Fox, St. Hubert declared in opposition to summary judgment that epilepsy affects his life and substantially limits his ability to work because a seizure is unexpected and incapacitating. During a seizure at a workplace in 2019 (not at Fox), he was taken to the hospital.

Human resources expert Regina Romeo declared that the limitations of an employee with epilepsy are "open, obvious and apparent to the employer." It is "self-evident" because "epilepsy involves seizures," creating an immediate urgency to interact with and accommodate the employee.

8

**St. Hubert's Employment at Fox Ends**

On August 21, Bourke wrote Johnson that team members complained about St. Hubert, adding, "I need to sort this out today." He did not take St. Hubert's epilepsy into account. Johnson told Bourke to "end him today." St. Hubert declares that Fox "fail[ed] to recognize that the epileptic medication had been making me feel 'cloudy' and was affecting my personality" or that he had a seizure 11 days earlier. He did not tell anyone at Fox that he felt "cloudy," was affected by medication, or had a seizure.

Bourke asked TenTek to remove St. Hubert from Fox. TenTek complied. Elizondo called St. Hubert at the end of his shift to say it was his last day at Fox, which St. Hubert described as "a complete surprise." St. Hubert did not speak to Bourke or Johnson. His complaint alleges that Elizondo told him there was a communication breakdown. St. Hubert declares that he was "an exemplary employee" and the only reason he was terminated was because of his epilepsy, which Fox ignored and did not accommodate.

Elizondo wrote a TenTek colleague that Fox let St. Hubert go due to "his communication style and behavior." After team members said they "could no longer handle Joey's authoritative style of leading them," Fox felt "it was best to release him." The message does not mention epilepsy. Fox agreed to pay St. Hubert until the end of August.

On August 21, when he was released from Fox, St. Hubert texted his team, "I wish you nothing but the best in your journey. My line is always open. No hard feelings." On August 22, he e-mailed Fox's Bourke, Johnson and Garrett Boss, along with Elizondo at TenTek, to say, "I will be analyzing this experience to understand better what went wrong. . . . [T]hank you for the

opportunity of a lifetime. Not a single hard feeling. Not one. . . . From the very bottom of my heart, and with the utmost sincerity, Thank you ever so kindly!" On September 10, St. Hubert wrote TenTek that "the work I did for Fox gave me a whole new confidence and perspective, an amazing opportunity." Since leaving Fox, he has not disclosed his epilepsy to subsequent employers.

**PROCEDURAL HISTORY**

St. Hubert alleges that he obtained a right-to-sue letter from the Department of Fair Employment and Housing in September 2020.[3] His lawsuit alleges causes of action for disability discrimination; wrongful termination; retaliation; and failure to prevent unlawful conduct. Fox moved for summary judgment. St. Hubert opposed the motion.

The court granted the motion. It found that St. Hubert "had a history of performance and interpersonal issues." Fox decided to terminate him—and another person was being trained to replace him—before he disclosed his epilepsy diagnosis. He never requested accommodations and none were required because St. Hubert mitigated the risk of seizure with medication. Moreover, he testified that his condition never interfered with his ability to do his job.

The court found St. Hubert did not show that the decision to terminate him was based on his disclosure of epilepsy. Other team members disliked his way of dealing with them. Fox did

---

[3] Although the right-to-sue letter is not attached to the pleading, Fox does not contest that St. Hubert exhausted his administrative remedy. (§§ 12960, 12965; *Pollock v. Tri-Modal Distribution Services, Inc.* (2021) 11 Cal.5th 918, 931; *Hon v. Marshall* (1997) 53 Cal.App.4th 470, 475.)

10

not have to engage in the interactive process because he never requested an accommodation and epilepsy did not affect his work. He did not tell Fox his medication made him feel "cloudy" or affected his personality. Medical reports show no seizures from January to December 2020, during his assignment at Fox. No triable issues were raised. The court entered judgment for Fox.

## DISCUSSION

### 1. Appeal and Review

The judgment is appealable. (Code Civ. Proc., § 904.1., subd. (a)(1).) Summary judgment is appropriate when no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) We independently examine the record to determine if triable issues of fact exist. (*Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56, 64.) Evidence presented in opposition to summary judgment is liberally construed. (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618.)

### 2. Claim of Failure to Accommodate a Disability

St. Hubert contends that the court erred by granting summary judgment on his second cause of action, which alleges that Fox discriminated against him by failing to accommodate his disability. (§ 12940, subd. (m).) Summary judgment was properly granted because there is no triable issue as to whether Fox failed to accommodate him.

A claim of failure to accommodate requires a showing that (1) the employee has a disability covered by FEHA, (2) the employee can perform the essential functions of the position with a reasonable accommodation, and (3) the employer failed to accommodate the disability. (*Brown v. Los Angeles Unified*

11

*School Dist.* (2021) 60 Cal.App.5th 1092, 1107–1108.)[4] St. Hubert showed that he has a disability covered by FEHA. Fox does not contest that epilepsy is listed as a disability in FEHA. (§ 12926.1, subd. (c); Cal. Code Regs., tit. 2, § 11065, subd. (d)(2)(C).) The first element of the claim is satisfied.

As to the second element, St. Hubert agrees that he can perform his job despite having epilepsy. His testimony proves he had no limitations. Asked if epilepsy interferes with daily activities, he answered, "No. I'm able to operate like a fully functioning adult." He specifically denied that epilepsy ever interfered with his work at Fox. Quite simply, he did not require accommodations to perform the essential functions of his job.

St. Hubert's testimony is " 'a clear and unequivocal admission by the plaintiff, himself, in his deposition' " negating the existence of a triable issue of fact. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21 (*D'Amico*).) On summary judgment, such an admission "is entitled to and should receive a kind of deference not normally accorded evidentiary allegations in affidavits." (*Id.* at p. 22.)

Aware that his testimony did not assist his case, St. Hubert declares that epilepsy "definitely has caused not only limitations in my life, but substantial limitations. It has also caused substantial limitations in my ability to work."

---

[4] St. Hubert's reply notes that he must prove he was harmed to prevail on his claim. The parties do not address the issue, but it is difficult to see how St. Hubert was harmed by lack of accommodation in the two days between his disclosure of epilepsy to Fox supervisors and the cessation of his assignment; he had no seizure in that brief period.

Discovery admissions cannot be contradicted by " 'self-serving declarations of a party.' [Citations.]  In a nutshell, the rule [in *D'Amico*] bars a party opposing summary judgment from filing a declaration that purports to impeach his or her own prior sworn testimony." (*Scalf v. D. B. Log Homes, Inc.* (2005) 128 Cal.App.4th 1510, 1521–1522.)  In short, "After-the-fact attempts to reverse prior admissions are impermissible because a party cannot rely on contradictions in his own testimony to create a triable issue of fact." (*Thompson v. Williams* (1989) 211 Cal.App.3d 566, 573; *Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 653.)

Apart from admitting his work was unaffected, St. Hubert never informed Fox of limitations.  " 'The duty of an employer reasonably to accommodate an employee's handicap does not arise until the employer is "aware of [the employee's] disability and physical limitations." ' " (*Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 949–950.)  " 'An employee cannot demand clairvoyance of his employer.'  [Citation.]  ' "Where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer," ' the employee bears the burden ' "to *specifically* identify the *disability* and *resulting limitations*, and to suggest reasonable accommodations." ' " (*Doe v. Department of Corrections & Rehabilitation* (2019) 43 Cal.App.5th 721, 738–739 (*Doe*) [applying § 12940, subd. (m)].)  Only the employee understands a physical or mental condition well enough to disclose limitations requiring accommodation.  (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 443 [employee cannot "secretly want[ ] a particular accommodation and sue the employer for not providing it"].)

13

St. Hubert's disability was not open, obvious, or apparent. He never had a seizure while working at Fox; never told Fox that medication clouds his judgment or affects his personality; and did not disclose limitations.[5] At most, St. Hubert revealed the bare fact of his epilepsy diagnosis after Fox notified TenTek of its intent to end his assignment.

Merely disclosing a disability is not enough. Employers must " 'accommodate limitations, not disabilities.' " (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1013.) Accommodation means (1) making existing facilities accessible and usable or (2) job restructuring, modified schedules, job reassignment, modification of equipment or training, provision of interpreters, and similar means. (§ 12926, subd. (p).) St. Hubert does not explain how the accommodations listed by statute would help him, as he did not identify any work limitations. Indeed, he testified that he did not disclose his epilepsy to his current employer: It undermines his claim that Fox wrongfully failed to accommodate him when he continues not to seek accommodation for the same medical condition even now.

### 3. Retaliation Claim

St. Hubert argues that the court erroneously granted summary judgment on his fourth cause of action for retaliation. His pleading cites section 12940, subdivision (h), making it unlawful for an employer "to discharge, expel, or otherwise discriminate against any person [who] has opposed any practices

---

[5] The declaration of human resources expert Romeo does not assist St. Hubert. She opines that epilepsy is open, obvious, and apparent because it involves seizures. St. Hubert's condition was not self-evident because the undisputed evidence shows he never had a seizure at Fox.

forbidden under this part or . . . filed a complaint, testified, or assisted in any proceeding under this part."

A claim of retaliation has three elements. First, the employee must establish a prima facie case of retaliation. Second, the employer must articulate a legitimate nonretaliatory reason for its conduct. Third, the employee must show the employer's reason is pretextual. (*Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 476.) A prima facie case requires the employee to show protected activity; an adverse employment action; and a causal link between the employee's protected activity and the employer's action. (*Ibid.*; *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.) St. Hubert alleges that Fox retaliated for his "participating in a protected activity, such as disclosing his/her disability or seeking . . . accommodations, or seeking to engage in the interactive process."

Under the plain language of the statute, St. Hubert has not shown he engaged in protected activity because he "*opposed any practices* forbidden" by FEHA or "*filed a complaint*, testified, or assisted in any proceeding" under FEHA. (§ 12940, subd. (h), italics added; *Heath v. AT&T Corp.* (N.D.Cal. Sept. 12, 2005, No. C-05-0719 VRW) 2005 U.S.Dist. Lexis 34334, *25–*26 [retaliation not alleged where employee did not show he was discharged for opposing practices forbidden by FEHA or for participating in a FEHA proceeding, but "simply alleges that [he] was fired because [he] was disabled"].)

St. Hubert did not "oppose" Fox's refusal to accommodate a disability. He never requested accommodation. Merely knowing of a disability did not put Fox on notice that accommodation was required. (*Doe, supra,* 43 Cal.App.5th at pp. 738–739.) Not until

15

this litigation did he reveal a blackout, and perhaps a seizure, occurring at home on August 10.

St. Hubert cites section 12940, subdivision (m)(2), which forbids retaliation "against a person for requesting accommodation." Once again, St. Hubert did not request accommodation. Instead, he indicated that *he* was developing an appropriate crisis mitigation plan.

No reasonable inference can be drawn that Fox retaliated against St. Hubert for disclosing epilepsy. Eight days *before* his disclosure, Bourke directed him to train Hernandez on his tasks. Five days *before* his disclosure, Fox Vice-president Johnson told Bourke to "get rid of" St. Hubert; Bourke replied that St. Hubert still needed "to hand over his tasks." One day *before* his disclosure, Bourke and Elizondo at TenTek had "a chat about Joey." They agreed he would leave Fox that month after training his replacement. His termination was underway before his disclosure, refuting his claim that it was a newly minted response to his disclosure.

The evidence shows mounting problems with St. Hubert's performance and complaints from colleagues. As early as July, he failed to return a computer to a Fox employee and another employee complained of his "rude and condescending" behavior. By August, Bourke observed that St. Hubert did not complete tasks, follow instructions, pay attention to detail, or have the experience claimed in his resume. Johnson was displeased that he "did not have good or correct answers" and failed to execute a simple task for a Fox executive. Team members felt he was condescending, demeaning, manipulative, and made their jobs difficult. He did not produce work or respond to messages, and was ineffectual.

16

St. Hubert's efforts to show pretext fall short of a viable FEHA claim.

He cites the two-day gap between his disclosure and his termination as proof of retaliation. "[T]emporal proximity by itself . . . is not adequate to show pretext." (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 357 [employee fired days after filing worker's compensation claims].) He does not deny that he was admonished a month after starting at Fox, or alienated coworkers. Given the evidence of nonretaliatory reasons to terminate, the proximity of his termination to his disclosure does not create a triable issue of fact on summary judgment. (*Ibid.*)

St. Hubert's declaration describing his work as exemplary does not suffice because "an employee's subjective personal judgments of his or her competence alone do not raise a genuine issue of material fact." (*Horn v. Cushman & Wakefield Western* (1999) 72 Cal.App.4th 798, 816.) Fox gave St. Hubert a lead position because he was the most experienced person on a new young team but qualified the appointment by saying it would be reviewed monthly to optimize productivity; no pay raise was given. Matters quickly went downhill after he became leader of a team that found him controlling, difficult, and obstructionist. Bourke e-mailed that it was not one disgruntled team member; instead, "they all hate Joey." Pretext is not shown by Fox's determination that he was not a good fit with the IT team, even if it seems "one-sided" to him.

No evidence supports St. Hubert's claim that no other team members were released; assuming that it is true, no evidence shows that they caused problems. He speculates that Johnson's August 14 directive to "get rid" of St. Hubert only applied to his lead position, not to his contract at Fox. This is not a reasonable

17

inference.  Bourke testified, without contradiction, that he intended to "get rid" of St. Hubert by "ending his contract," not just the lead position.

After St. Hubert's epilepsy disclosure, Johnson wrote Bourke that it did not change the decision to terminate later that month, unless St. Hubert's performance "drastically improved." Far from supporting St. Hubert's claim of pretext, the message shows that Johnson was open to continuing the contract after the disclosure.  However, after Johnson wrote the message, matters worsened when team members came forward to complain about St. Hubert, causing Bourke to move up the termination date.

St. Hubert cites Johnson's August 12 list of action items for completion by the end of September as proof that Fox was happy with his work and did not contemplate ending his assignment until after he disclosed his epilepsy.  The message went to St. Hubert as leader of the IT team; it does not state that others could not fulfill the tasks.  In fact, Bourke's response states that Hernandez was working on them.  Nor does it disprove that Fox supervisors subsequently decided to get rid of St. Hubert, before he disclosed his epilepsy.

### 4.  Derivative and Punitive Damages Claims

St. Hubert agrees that his causes of action for wrongful termination and failure to prevent discrimination derive from his FEHA claims.  As discussed above, his FEHA claims were properly dismissed.  As a result, his derivative claims cannot proceed, nor can his claim for punitive damages go forward. Finally, his brief does not address his first cause of action, forfeiting the claim.

**DISPOSITION**

The judgment is affirmed.  Respondent is entitled to recover its costs on appeal.

NOT TO BE PUBLISHED.


                                            LUI, P. J.

We concur:



ASHMANN-GERST, J.



CHAVEZ, J.


19